Juan Rigores **SARDINO**, Plaintiff-Appellant,

v.

The **FEDERAL RESERVE BANK OF NEW YORK** and the Secretary of the Treasury of the United States, Defendants-Appellees.

No. 180, Docket 29560.

United States Court of Appeals
Second Circuit.

Argued Dec. 9, 1965.

Decided April 22, 1966.

Victor Rabinowitz, Leonard B. Boudin, New York City (Rabinowitz & Boudin, New York City), for appellant.

Bruno A. Ristau, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., Robert M. Morgenthau, U. S. Atty., Morton Hollander, Washington, D. C.), for defendants-appellees.

Before LUMBARD, Chief Judge, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

Plaintiff Sardino, a Cuban residing in Havana, has a savings account in a New York bank of some $7000, this being the proceeds of an insurance policy on the life of his son who died in New York. The bank would not remit the funds to Sardino in Cuba because the Cuban Assets Control Regulations,[1] 31 C.F.R.

---

1. These provide:

§ 515.201. Transactions involving designated foreign countries or their nationals; effective date.

(a) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if either such transactions are by, or on behalf of, or pursuant to the direction of a foreign country designated under this part, or any national thereof, or such transactions involve property in which a foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

(1) All transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States:

(2) All transactions in foreign exchange by any person within the United States; and

(3) The exportation or withdrawal from the United States of gold or silver coin or bullion, currency or securities, or the earmarking of any such property, by any person within the United States.

(b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

(1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States; and

(2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States.

(c) Any transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions set forth in paragraphs (a) or (b) of this section is hereby prohibited.

(d) For the purposes of this part, the term "foreign country designated under this part" and the term "designated foreign country" mean Cuba and

§ 515.201, issued pursuant to the Trading with the Enemy Act, § 5(b) (1), 50 U.S.C. App. § 5(b) (1), prohibited transfers outside the United States of property owned by Cuban nationals except with specific authorization. The Federal Reserve Bank of New York, acting as agent for the Secretary of the Treasury, refused to issue the required license because "transactions of this type are not consistent with the present policy of this Government with respect to Cuba." Sardino thereupon brought this action in the District Court for the Southern District of New York against the Federal Reserve Bank and the Secretary of the Treasury for a direction that they issue a license or a declaration that none was required; he contended that the Regulations were not authorized by the statute and that, if they were, the statute and the Regulations were unconstitutional as applied to him for various reasons discussed hereafter. Judge Palmieri granted defendants' motion to dismiss the complaint for failure to state a claim upon which relief could be granted. This appeal followed.

## I.

The statutory authority for the Regulations seems plain enough. Section 5(b) (1) of the Trading with the Enemy Act, 50 App. U.S.C. § 5, says that:

"During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through or to any banking institution and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

by any person, or with respect to any property,[2] subject to the jurisdiction of the United States."

On December 16, 1950, President Truman, taking particular note of "recent events in Korea and elsewhere" but also making general reference to "the increasing menace of the forces of communist aggression," proclaimed the existence of a national emergency. 64 Stat. A454. The declaration has never been revoked; rather it has been repeatedly and recently reaffirmed. Exec.Order No. 10896, 25 F.R. 12281 (1960); Exec.Order No. 10905, 26 F.R. 321 (1961); Exec.Order No. 11037, 27 F.R. 6967 (1962). While the courts will not review a determination so peculiarly within the province of the chief executive, there can hardly be doubt as to the existence of an emergency today when thousands of United States troops are in action and many more are in readiness around the globe. Plaintiff's contention that the national emergency provision, which came into the statute at the time of the economic crisis of 1933, 48 Stat. 1, is limited to economic emergencies, is sufficiently answered by the breadth of the language. The understanding that the words mean all they

---

the term "effective date" and the term "effective date of this section" mean with respect to Cuba, or any national thereof, 12:01 a. m., e. s. t., July 8, 1963.

**2.** The President has delegated the powers granted him by this legislation to the Secretary of the Treasury. 7 F.R. 1409 (1942). On October 15, 1962, the Secretary delegated the administration of foreign assets control regulation to the Office of Foreign Assets Control, Treas. Dept. Order 128.

say was illustrated by President Roosevelt's freezing the assets of nationals of Norway and Denmark on the invasion of those countries by Germany long before the United States was at war, Exec. Order No. 8389, 5 F.R. 1400 (1940).[3] We take the prompt Congressional ratification, 54 Stat. 179 (1940), as a demonstration of approval of what was already lawful rather than as an indication of doubt. See Pike v. United States, 340 F.2d 487, 488 (9 Cir. 1965).

■ The claim that the statute constitutes an unconstitutional delegation of legislative power is foreclosed by United States v. Curtiss-Wright Export Co., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). Although the delegation there sustained was narrower than that in § 5 (b) of the Trading with the Enemy Act, the Court's opinion was not thus circumscribed. Painting with a broad brush, extensively analyzing the source of the foreign affairs power of the central government, and emphasizing the wide delegations by early Congresses familiar with the intent of the framers, the Court rather plainly meant to make clear, once and for all, that "if, in the maintenance of our international relations, embarrassment—perhaps serious embarrassment—is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." 299 U.S. at 320, 57 S.Ct. at 221. See also Zemel v. Rusk, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); United States v. Von Clemm, 136 F.2d 968, 970 (2 Cir.), cert. denied, 320 U.S. 769, 64 S.Ct. 81, 88 L.Ed. 459 (1943).

■ The claim that the Constitution is violated by the President's delegation of his power to issue regulations to the Secretary of the Treasury and the latter's delegation of administration of the regulations to the Office of Foreign Assets Control, is likewise insubstantial. The founders could not have meant to impose upon the President burdens that would make it humanly impossible to conduct his office as the nation grew. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 165, 2 L.Ed. 60 (1803). Congress can validly authorize the President to depute a portion of his duties in the field of foreign affairs, as it can do with other high officers. Cf. Jay v. Boyd, 351 U.S. 345, 351 n. 8, 76 S.Ct. 919, 100 L.Ed. 1242 (1956). The safeguard remains, as stated in the 1816 report of the Senate Committee on Foreign Relations, that for all that is done, whether by him or in his name, the President "is responsible to the Constitution." See United States v. Curtiss-Wright Export Corp., supra, 299 U.S. at 319, 57 S.Ct. 216, 81 L.Ed. 255.

The only substantial contention is that the Regulations, as they have been applied to Sardino, deprive him of his property without due process of law in violation of the Fifth Amendment. The Government makes a three-fold response —Sardino has not been deprived of property, the Fifth Amendment does not protect non-resident aliens, and in any event the Government's action was not violative of due process.

The contention that Sardino has not been deprived of his property stresses that the Government has not taken over the bank account but has merely placed a temporary barrier to its transfer outside the United States. Indeed, the barrier is said to be not merely temporary but partial. Without a license Sardino can use the account to pay customs duties, taxes or fees owing to the United States, a state, or any instrumentality of either, 31 C.F.R. § 515.510, or can have the sum belonging to him invested in securities listed on a national securities exchange or issued by the United States,

---

**3.** The extension of this program to nationals of other countries invaded by Germany and Japan is described in Goodman,

United States Government Foreign Property Controls, 52 Geo.L.J. 767, 768–69 (1964).

a state, or an instrumentality of either, 31 C.F.R. § 515.513; the Regulations also permit remittance not in excess of $100 a month for necessary living expenses, but only through payment to a blocked account of a Cuban bank in the United States, 31 C.F.R. § 515.521. Sardino effectively replies that he owes no customs duties, taxes or fees; that securities purchased at his instruction would be blocked to the same extent as the savings account; and that there would be little incentive for a Cuban bank to make monthly payments to him in Havana when the corresponding payments to it in the United States were blocked. To be sure, all this could change in short order if this country's relations with Cuba were to alter for the better. But the very considerations urged by the Government as showing that the emergency declared by President Truman in 1950 exists in 1966 cast doubt on the reality of this prospect. While the Government points out also that, despite the broad language of the Regulations, § 515.201(a), the funds would be made available to Sardino if he sought refuge in this country as many of his fellow Cubans have done, see 49 Dept. of State Bull. 160 (1963), the record contains nothing to show any intention on his part to do this. The due process clause speaks in terms not of taking but of deprivation; we find it hard to say there is no deprivation when a man is prevented both from obtaining his property and from realizing any benefit from it for a period of indefinite duration which may outrun his life. Compare Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922); Goldblatt v. Town of Hempstead, 369 U.S. 590, 592–594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); ALI, Restatement of Foreign Relations Law § 197 (Proposed Official Draft 1962).

■ The Government's second answer that "The Constitution of the United States confers no rights on non-resident

aliens" is so patently erroneous in a case involving property in the United States that we are surprised it was made. Throughout our history the guarantees of the Constitution have been considered applicable to all actions of the Government within our borders—and even to some without. Cf. Reid v. Covert, 354 U.S. 1, 5, 8, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).[4] This country's present economic position is due in no small part to European investors who placed their funds at risk in its development, rightly believing they were protected by constitutional guarantees; today, for other reasons, we are still eager to attract foreign funds. In Russian Volunteer Fleet v. United States, 282 U.S. 481, 489, 491–492, 51 S.Ct. 229, 75 L.Ed. 473 (1931), the Court squarely held that an alien friend is entitled to the protection of the Fifth Amendment's prohibition of taking without just compensation—even when his government was no longer recognized by this country. And the Court has declared unequivocally, with respect to non-resident aliens owning property within the United States, that they "as well as citizens are entitled to the protection of the Fifth Amendment." United States v. Pink, 315 U.S. 203, 228, 62 S.Ct. 552, 564, 86 L.Ed. 796 (1942). See also Guessefeldt v. McGrath, 342 U.S. 308, 317–319, 72 S.Ct. 338, 96 L.Ed. 342 (1952).

■ It does not follow, however, that in dealing with the property of an alien the United States must be blind to the acts of the country of which he is a national; the Constitution protects the alien from arbitrary action by our govment but not from reasonable response to such action by his own. The world today is not the classical international law world of black squares and white squares, where everyone is either an enemy or a friend. We are not formally at war with Cuba but only in a technical sense are we at peace—as the Havana Conference, held since this

4. Exclusion of an alien is another matter. Fong Yue Ting v. United States, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893);

United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950).

appeal was argued,[5] has dramatically shown. The founders could not have meant to tie one of the nation's hands behind its back by requiring it to treat as a friend a country which has launched a campaign of subversion throughout the Western Hemisphere. Compare Dennis v. United States, 341 U.S. 494, 561–576, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (concurring opinion of Mr. Justice Jackson). Hard currency is a weapon in the struggle between the free and the communist worlds; it would be a strange reading of the Constitution to regard it as demanding depletion of dollar resources for the benefit of a government [6] seeking to create a base for activities inimical to our national welfare.[7] The Supreme Court's approval of wartime seizure of assets of a non-enemy alien "as a means of avoiding the use of the property to draw earnings or wealth out of this country to territory where it may more likely be used to assist the enemy than if it remains in the hands of this government," Silesian-American Corp. v. Clark, 332 U.S. 469, 476, 68 S.Ct. 179, 182, 92 L.Ed. 81 (1947), is broad enough to justify the refusal of a license to Sardino.

■ Still other considerations support the constitutionality of the freezing order. Cuba has adopted a program expropriating property within its territory owned by designated American nationals, with a system of compensation holding out only an "illusory" possibility of payment. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401–405, 84 S.Ct. 923, 11 L.Ed.2d 804 and nn. 3, 4 and 7 (1964). Although recognizing the Cuban expropriation under the act of state doctrine, the Court in that case pointed to the very freezing regulations here at issue as exemplifying "the capacity of the political branches to assure, through a variety of techniques * * * that the national interest is protected against a country which is thought to be improperly denying the rights of United States citizens." 376 U.S. at 412, 84 S.Ct. at 932. We see no need to debate whether this approving nod was dictum or a ground for recognition of the expropriation of property of our nationals in Cuba, which the Court might have declined to make if it had thought the United States powerless to protect itself by freezing the property of Cuban nationals here. There is a long history of governmental action compensating our own citizens out of foreign assets in this country for wrongs done them by foreign governments abroad. A famous instance is the Litvinov Assignment by which claims of the Soviet Union and its nationals [8] against the United States and its nationals were transferred to our Government to be used to reimburse American citizens whose property had

---

5. The First Conference of the Solidarity of Peoples of Asia, Africa, and Latin America was held in Havana on January 3–15, 1966, to organize a program of subversion against the United States. The Conference created a General Secretariat having its headquarters at Havana and headed by the chairman of Cuba's Foreign Relations Committee. According to one commentator, "Havana was a natural choice as the operational headquarters for world-wide subversion and wars of national liberation, for it is dedicatedly anti-American and pro-Soviet, and has a well-developed apparatus of subversion already active in the hemisphere." Bethel, The Havana Conference, The Reporter, March 24, 1966, at 25, 28.

6. Any dollar exchange received by Sardino would have to be exchanged for pesos at the National Bank of Cuba within ten days, Law No. 30 of Feb. 23, 1961, Art. 23, 29 Leyes del Gobierno Provisional de la Revolución 25 (1961); 13 International Monetary Fund Annual Report on Exchange Restrictions 91 (1962).

7. See Joint Resolution of Oct. 3, 1962, 76 Stat. 697; Dept. of State Pub. No. 7171, 25–28 (1961); 47 Dept. of State Bull. 599 (1962); Report of the Investigating Committee appointed by the Council of the OAS, OEA/Ser. G/IV (1964); Resolution I, Ninth Meeting of Consultation of Ministers of Foreign Affairs, OEA/Ser. F./II.9 (1964).

8. One of these was by the Russian Volunteer Fleet, whose claim had been the occasion for the Supreme Court's pronouncement that the Fifth Amendment protected non-enemy aliens from a taking of their property without just compensation, 282 U.S. 481, 51 S.Ct. 229 (1931).

been seized in Russia. See United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), and United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942). Although there the taking of the assets of the Russian corporations had been accomplished by their own government and the foreign creditors in *Pink* had no rights of ownership in the corporate assets transferred to the United States, other precedents cannot be disposed of on those grounds. The Treaty of Berlin, 42 Stat. 1939, 1940–1941 (1921), terminating World War I with Germany, confirmed the retention of vested enemy property in the control of the United States until the German government had satisfied all war claims of our citizens; the Supreme Court has said "it does not matter whether this action was taken simply to secure claims of American citizens against Germany or was regarded as the rightful withholding of spoils of war." Guessefeldt v. McGrath, 342 U.S. 308, 313–314, 72 S.Ct. 338, 96 L.Ed. 342 (1952). The treaties of peace with Bulgaria, Hungary and Roumania at the end of World War II provided that any property of their nationals, blocked long before we were at war, Exec.Order No. 8389 of April 10, 1940, should vest in an agency or officer designated by the President and, after payment of debts owed by the owner, should be used to pay claims of United States nationals against the three countries. 22 U.S.C. §§ 1631a, 1641a. While these had been enemy countries, it is not clear that this was crucial. See Guessefeldt v. McGrath, supra; 2 O'Connell, International Law 846–48 (1965). In any event Congress followed the same course to compensate United States citizens for Czechoslovakian expropriations occurring after the war, setting up a fund out of the proceeds of Czech-owned steel mill equipment ordered here in 1947 and blocked and sold in 1954 by the Secretary of the Treasury. 22 U.S.C. §§ 1642a, 1642c, and 1642l; see 1958 U.S. Code Cong. & Ad.News 3299, 3301.

 Congress has already taken steps to determine the claims of our na-tionals against Cuba, 22 U.S.C. § 1643, although without as yet providing for their payment. In Propper v. Clark, 337 U.S. 472, 484, 69 S.Ct. 1333, 1340, 93 L.Ed. 1480 (1949), the Court noted that a pre-war freezing order served the salutary purpose of immobilizing the assets of foreign nationals until our Government could determine whether they were needed "to compensate our citizens or ourselves for the damages done by the governments of the nationals affected." This would seem a rather clear intimation that if Congress should ultimately choose to apply the blocked assets of Cuban nationals to that purpose, the Fifth Amendment would not stand in its way. The unquestioned right of a state to protect its nationals in their persons and property while in a foreign country, see 1 Oppenheim, International Law § 319, at 686–87 (8th ed. Lauterpacht 1955), must permit initial seizure and ultimate expropriation of assets of nationals of that country in its own territory if other methods of securing compensation for its nationals should fail. See Colbert, Retaliation in International Law 63–69 (1948). To be sure, Congress has not yet chosen to invoke the ultimate sanction, having indeed eliminated a provision for the sale of certain Cuban assets to pay the expenses of administering the claims program, see 79 Stat. 988 (1965), amending 78 Stat. 1113 (1964), and 1965 U.S.Code Cong. & Ad. News 3581, 3583–3584. Such commendable forbearance should not be understood as connoting lack of power.

## II.

 Although the foregoing disposes of the contentions raised by the appellant, we must now consider a point not suggested either by him or by the Government and consequently neither considered by the district court nor noted by us at the argument. This is whether we must vacate Judge Palmieri's order on the ground that the action was within 28 U.S.C. § 2282, commanding that:

"An interlocutory or permanent injunction restraining the enforcement,

operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

It seems indeed passing strange that a statute intended to protect the Government against invalidation of an Act of Congress by a district judge without the assistance of two other judges, one of whom shall be a circuit judge, could be read as requiring a fresh start in a case where no one has invoked the procedure thus afforded, only questions of law were presented, the district judge validated the challenged legislation,[9] and three circuit judges had come to the same conclusion before the point was noticed. Indeed, if the case required, we would be disposed to reexamine whether despite intimations by the Supreme Court, Kennedy v. Mendoza-Martinez, 372 U.S. 144, 153, 83 S.Ct. 554, 9 L.Ed. 2d 644 (1963), and decisions of other circuits, Riss & Co. v. Hoch, 99 F.2d 553, 555 (10 Cir. 1938); Borden Co. v. Liddy, 309 F.2d 871 (8 Cir. 1962), cert. denied, 372 U.S. 953, 83 S.Ct. 951, 9 L.Ed.2d 977 (1963), so bizarre a result was truly demanded. Cf. D. Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 76–77 (1964).[10] We have concluded, however—although with the misgivings regularly encountered in applying this deceptively simple statute and its counterpart, § 2281, dealing with state legislation—that the case did not fall within § 2282, since the substantial constitutional attack was not upon the Trading with the Enemy Act but upon the Cuban Assets Control Regulations.

When Congress adopted what is now § 2282 by the Act of August 24, 1937, 50 Stat. 751, it had as a model § 266 of the Judicial Code, now 28 U.S.C. § 2281. That statute, originally enacted in 1910, 36 Stat. 557, requiring three-judge courts when a plaintiff sought to restrain the enforcement of any "statute of a state" upon the ground of unconstitutionality, was amended in 1913 to include "an order made by an administrative board or commission acting under and pursuant to the statutes of such State." 37 Stat. 1013. In adopting § 2282 Congress declined to follow that precedent. Only Acts of Congress were mentioned; orders of federal boards and commissions were not. Despite a statement that the 1913 amendment was "superfluous," Oklahoma Natural Gas Co. v. Russell, 261 U.S. 290, 292, 43 S.Ct. 353, 67 L.Ed. 659 (1923), the Supreme Court later held that the omission of any reference to federal administrative regulations or orders in § 2282 must be regarded "as deliberate and as indicating a limitation deemed to be advisable. It does not appear to have been the intention of Congress that direct appeal should lie to this Court when administrative action and not the Act of Congress is assailed." William Jameson & Co. v. Morgenthau, 307 U.S. 171, 173–174, 59 S.Ct. 804, 805, 83 L.Ed. 1189 (1939). Accordingly the Court dismissed the appeal in that case since, although both the authorizing statute and the Treasury Regulations were claimed to be unconstitutional, the Court regarded the attack on the former as insubstantial. See also Coffman v. Breeze Corps., 323 U.S. 316, 317–318, n. 1, 65 S.Ct. 298, 89 L.Ed. 264 (1945).

9. It is settled that, despite their apparently contrary wording, the three-judge statutes, 28 U.S.C. §§ 2281 and 2282, apply although the single judge did not grant relief. Ex parte Metropolitan Water Co. of West Virginia, 220 U.S. 539, 31 S.Ct. 600, 55 L.Ed. 575 (1911).

10. The very fact that the alleged jurisdictional defect could probably be cured by our vacating the district court's judgment, see Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 716, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962), and the Chief Judge's designating Judge Palmieri and two of us to constitute the three-judge court, argues against such useless shuffling rather than for it.

To be sure, *Jameson* cannot mean that § 2282 is rendered inapplicable simply because an order is the immediate object of the attack. Acts of Congress are not self-enforcing and when the executive or administrative action complained of is so plainly directed or permitted by the statute that no fair construction could hold otherwise, see Rusk v. Cort, 369 U.S. 367, 370 n. 4, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962); Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); Schneider v. Rusk, 372 U.S. 224, 83 S.Ct. 621, 9 L.Ed.2d 695 (1963), the constitutionality of the statute is necessarily drawn in question. See D. Currie, supra at 53. The gray area is when an Act of Congress confers authority on an administrator in general terms which could be read either to embrace or to exclude the challenged action, and application of the statute is clearly constitutional in certain cases but arguably not so in the administrative scheme under attack. From a merely conceptual standpoint it could be said that the plaintiff is challenging the constitutionality of the Act as applied, and Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 42 S.Ct. 106, 66 L.Ed. 239 (1921), could be cited to support that view. Whatever the philosophical merits of such an argument, its acceptance in this area would largely drain of vitality the distinction taken in *Jameson* and would improperly require the cumbersome three-judge procedure in cases where, if the court regarded the constitutional claim as serious, it would be bound to interpret the legislative mandate as not authorizing the regulation and leave the constitutionality of the Act of Congress untouched. Cf. United States v. Delaware & Hudson Co., 213 U.S. 366, 407–408, 29 S.Ct. 527, 53 L.Ed. 836 (1909); Kent v. Dulles, 357 U.S.

116, 129, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). In this latter respect the problem under § 2282 differs vitally from that in *Dahnke-Walker*, dealing with appeals to the Supreme Court from state courts, 28 U.S.C. § 1257(2), where the reach of the statute has already been authoritatively determined by the state tribunal and the question of constitutionality must be resolved.[11] The Court has admonished, in a decision not irrelevant on its facts, that § 2281 should be read "not as a measure of broad social policy to be construed with great liberality, but as an enactment technical in the strict sense of the term and to be applied as such," Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941); and this Term's decision in Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), is further evidence of its disposition to give a rather narrow reading to the three-judge requirement of § 2281. Such considerations apply *a fortiori* to § 2282 where there is no clash of sovereignties and, for that reason or others, Congress deliberately occupied a smaller field.

For reasons elaborated in Part I of this opinion, we do not consider Sardino's claims of unconstitutional delegation in the Trading with the Enemy Act, § 5(b), to be substantial, and we should likewise not so regard a contention that the due process clause forbids Congress from making any provision for control of the property of a non-enemy alien in times of peace. Sardino's one serious constitutional argument, that a peacetime freeze of indefinite duration not clearly for his benefit violates due process, must thus be regarded as a claim that the administrators of an Act of Congress, valid if less expansively applied, acted with too heavy

11. In Zemel v. Rusk, 381 U.S. 1, 6, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), the Court went to some pains to avoid the issue here discussed, finding the attacks on the statute itself to be substantial; particularly in view of this we do not regard the brief *per curiam* in FHA v. The Darlington, Inc., 352 U.S. 977, 77 S.Ct. 381, 1 L.Ed.2d 363 (1957), as settling the law contrary to the views we have expressed.

a hand. As we read 28 U.S.C. § 2282, consideration of such a claim did not demand the convocation of a three-judge court.[12]

Affirmed.

---

12. We are thus not required to consider whether the district judge's failure to request the assistance of two others could be supported by the fact that the request was simply for a declaration of invalidity coupled with a mandatory injunction limited to Sardino's case, rather than for an order broadly prohibiting enforcement of the statute and Regulations. As to this, contrast FHA v. The Darlington, Inc., supra, 352 U.S. 977, 77 S.Ct. 381, 1 L.Ed.2d 363; Zemel v. Rusk, supra, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 with Kennedy v. Mendoza-Martinez, supra, 372 U.S. 144, 154–155, 83 S.Ct. 554, 9 L.Ed.2d 644. See also D. Currie, supra at 17 n. 94.