# Vesting of Iranian Assets

Because the International Emergency Economic Powers Act does not authorize vesting of foreign property, and the Trading with the Enemy Act authorizes vesting only in wartime, in the absence of a declaration of war against Iran it would be necessary to seek new legislation in order for the United States to take title to the blocked Iranian assets.

No domestic constitutional issue would be raised by legislation authorizing the vesting of Iranian government property; moreover, vesting for the benefit of either private claimants or the U.S. government would be consistent with principles of international law, either as a self-help method of securing payment for damages, or as a reprisal for Iran's continuing violations of international law.

Vesting legislation would have little effect on pending domestic litigation involving the blocked Iranian assets, and its effect on pre-judgment attachments would depend upon the validity of such attachments under state law. Vesting legislation would not be enforceable against property located abroad, and would therefore have no effect on foreign litigation involving Iranian dollar deposits in U.S. branch banks abroad, unless foreign courts were to hold that such dollar deposits are in reality located at the home office of the banks in the United States.

March 12, 1980

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

We have been asked to address a number of issues relating to possible vesting of Iranian assets. This preliminary response has been prepared in cooperation with the Civil Division.

### I. Existing Authority

At present no Iranian assets have been vested or seized. Vesting is a process by which the United States would take title to assets of a foreign country or its nationals. Under Executive Order No. 12,170 of November 14, 1979, the President blocked property of the Iranian government, its instrumentalities, and the Central Bank of Iran. 3 C.F.R. 457 (1979). The blocking order prevents property from being transferred or withdrawn, but does not permit its use by the United States or change title to it. This action was taken pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701 (Supp. I 1977) (IEEPA). This Act does not, however, provide authority to vest property.[1]

---

[1] No private property of Iranian nationals was blocked although the IEEPA is broad enough to permit this. It would be necessary for the President to issue an additional order to accomplish blocking

Continued

The Trading with the Enemy Act provides for both blocking and vesting of foreign property. 50 U.S.C. App. § 5(b). Until 1977, when the International Economic Powers Act was enacted, the Trading with the Enemy Act applied both during wartime and during any other period of national emergency declared by the President. It was amended, however, so that it now applies only during wartime. 91 Stat. 1625 (1977). Therefore, the national emergency relating to Iran declared by the President on November 14, 1979, does not trigger the Trading with the Enemy Act. If the Trading with the Enemy Act were to be used it would be necessary to declare war. In the absence of such a declaration it would be necessary to seek new legislation. We make no recommendation as to whether or not the United States should declare war on Iran.

## II. Proposed Legislation

If the Administration seeks legislation permitting vesting of Iranian assets a number of policy and legal questions would have to be faced. These include whether to provide in the legislation for disposition of the assets once vested and what that disposition should be.

We do not think that any domestic constitutional issue arises in the taking of Iranian government property. The Fifth Amendment by its terms applies only to the taking of "private property" without just compensation. Thus, on its face the Just Compensation Clause does not apply. The role of the Constitution in domestic law, as well as the text, supports this conclusion. Constitutional protections limit the power of the United States to act upon persons who are subject to its power by virtue of their presence in this country or their activities here. The United States asserts its power with respect to foreign nations because as a sovereign among equals it enjoys powers and privileges under international law and not because of its domestic authority.[2] Cf. *United States* v. *Curtiss-Wright Export Co.,* 299 U.S. 304, 315-18 (1936).

The precedents for this type of legislation have focused on providing for settlement of private claims against a foreign government, while government-to-government claims have been settled directly. *See* the International Claims Settlement Act of 1949, as amended, 22 U.S.C. § 1621 *et seq.* There is no reason, however, why the legislation has to be so limited. As discussed below, vesting for the benefit of either

of private property since the November 14 order only permits the Secretary of the Treasury to block Iranian government property. Presumably, such action would be necessary pending vesting legislation; otherwise, the property could be withdrawn in the interim. The vesting of private assets presents issues different from those concerning vesting of government assets, as we discuss below.

[2] Vesting property of private Iranian citizens presents constitutional issues which should be examined in detail if there is any intent to act regarding private property. *Russian Volunteer Fleet* v. *United States,* 282 U.S. 481 (1931). *But see Sardino* v. *Federal Reserve Bank,* 361 F.2d 106 (2d Cir. 1966), *cert. denied,* 385 U.S. 898 (1966).

private claimants or the United States government would be consistent with international law.

## III. International Law

### A. Damages

The United States has claimed that Iran has flagrantly violated its treaty obligations to the United States including those under the Vienna Conventions on Diplomatic and Consular Relations. Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, and Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820. Breach of an international agreement involves an obligation to make reparation in an adequate form, even when the treaty does not specify damages as a remedy. *E.g., Corfu Channel Case,* 1949 I.C.J. at pp. 23–24.

Self-help is recognized in international law as a method of securing payment for damages. The unquestioned right of a state to protect its nationals in their persons and property while in a foreign country must permit initial seizure and ultimate expropriation of assets if other methods of securing compensation should fail. *E.g., Sardino* v. *Federal Reserve Bank of New York,* 361 F.2d 106 (2d Cir.), *cert. denied,* 385 U.S. 898 (1966).

The United States is now proceeding against Iran in the International Court of Justice. The Court ruled as a preliminary matter on December 15, 1979, that Iran has violated pertinent treaties. It has not yet ruled on the question of damages. In January the United States submitted a Memorial (brief) to the Court seeking a judgment that the United States is "entitled to the payment to it, in its own right and in the exercise of its right of diplomatic protection of its nationals held hostage, of reparation . . . in a sum to be determined by the Court at a subsequent stage of the proceedings." It is likely that the issue of liability will be argued to the Court in the near future and there is every reason to anticipate a favorable judgment on the question. Such a judgment would, of course, lend support to any self-help remedies the United States may seek to apply. If in a subsequent hearing the Court were to find damages in an amount less than that seized by the United States, we might face the issue of whether part of the assets should be returned.

### B. Reprisal

Apart from the issue of damages, vesting may be viewed as a reprisal for the continuing violations of international law by Iran and thus as an element of our diplomatic efforts to end those violations. A. David, The Strategy of Treaty Termination: Lawful Breaches and Retaliations 234 (Yale Univ. Press, 1975). Non-forcible reprisals may be used in the case of breach of treaty obligations. *Commentary on Vienna Convention*

*on Law of Treaties*, [1966] 2 Y.B. Int'l L. Comm'n 253-54. Since other means of settling the dispute have failed, and since we can argue that seizure is reasonably proportional to the injury suffered, this action can be justified as meeting the standards of customary international law. *E.g.*, 12 M. Whiteman, Digest of Int'l Law 321-28. We take no position on whether vesting will be an effective method of resolving the diplomatic impasse.

### IV. Effect of Vesting on Pending Litigation

*A. Domestic Litigation*

What effect would a vesting of Iranian government-owned assets have on domestic suits—and especially on pre-judgment attachments which have been attempted by American creditors, primarily by American banks who have in their custody Iranian government deposits?

The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602, deals comprehensively with the suability of foreign states and their agencies and instrumentalities, and defines the circumstances under which property of such entities can be attached prior to judgment and levied upon in satisfaction of judgments. Whether a suit is properly brought and whether an attachment is valid is, therefore, a question of federal law; state law is relevant only in those instances where attachment is authorized under the Immunities Act; state law defines the rights obtained by an attachment creditor.[3]

Vesting of Iranian government-owned assets would have little effect on pending *suits*. It would be for the courts to determine on a case-by-case basis whether the Immunities Act confers jurisdiction. Vesting, however, would impact upon the pending pre-judgment attachments.

A majority of the attachments which have been sought are in all likelihood invalid because they either seek to reach property of the Iranian government not used for a "commercial purpose," or because the property sought to be reached belongs to an Iranian entity which is distinct from the debtor entity. An American claimant who attempted an unauthorized attachment would not be deprived of any cognizable property interests if the asset is vested and title passes to the United States.

In instances where attachments are proper under the Immunities Act, their legal effect would have to be determined under state law. A valid attachment would not be cancelled or annulled upon vesting, even if the property were "frozen" at the time the attachment was obtained. *Zittman* v. *McGrath*, 341 U.S. 446 (1951) (holding that a "right, title

---

[3] The Iranian Assets Control Regulations expressly authorize pre-judgment attachments. 31 C.F.R. § 535.418 (as added on December 19, 1979). But the regulations authorize such attachment only where federal or state law grants a right to a creditor to attach his debtor's property; the regulations themselves are not a source of substantive creditor's rights.

and interest" vesting leaves undisturbed any property interests acquired by a pre-vesting attachment creditor). When vesting property, the federal government merely steps into the shoes of the pre-vesting owner (here, the Iranian government). This does not mean that property in which an attachment creditor obtained an interest under state law is not subject to vesting. The Second *Zittman* case (*Zittman* v. *McGrath*, 341 U.S. 471 (1951)) teaches that the federal government may enforce a transfer of possession of the funds "for purposes of administration." During such administration—which is akin to a receivership—the pre-existing rights of attachment creditors must be preserved. State law would determine whether an attachment creditor would be entitled to a preference if the assets of the pre-vesting owner turn out to be insufficient to satisfy the obligation owed to the creditor.

## B. Effect on Foreign Litigation

Legislation authorizing the vesting of Iranian property would, under principles of international law, not be enforceable against property located abroad.[4] Iranian dollar deposits in U.S. branch banks abroad could be reached only if the foreign courts were to hold that such dollar deposits in U.S. branch banks are in reality located at the home office of the banks in the United States. Of course, that issue is presently being litigated in English and French courts with respect to the Presidential freeze order.

While authorizing vesting of domestic assets, Congress could confirm the preexisting Presidential freezing order on Iranian government-owned assets in the custody of American nationals abroad, in which case the pending litigation in England and France would continue. Congress could, in the alternative, lift the freeze on Iranian assets held by Americans abroad, thus mooting the litigation (as far as the extraterritorial reach of the Presidential freezing order is concerned).

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[4] *See Ingenohl* v. *Olsen*, 273 U.S. 541, 544 (1927): "If the Alien Property Custodian purported to convey rights in English territory valid as against those whom the English law protects he exceeded the powers that were or could be given to him by the United States." Attempts by states to extend their seizure powers extraterritorially have failed. *See, e.g., Republic of Iraq* v. *First National City Bank*, 353 F.2d 47 (2d Cir. 1965), *cert. denied*, 382 U.S. 1027 (1966).