# Presidential Power to Regulate Domestic Litigation Involving Iranian Assets

By its terms the International Emergency Economic Powers Act (IEEPA) gives the President broad authority to regulate the exercise of all rights and privileges "with respect to" foreign property, including their exercise in a judicial context. The legislative history of the IEEPA confirms that Congress intended the President to have discretionary power to regulate court proceedings involving claims to foreign property, as well as the transfer of or creation of interests in such property in a nonjudicial context.

The authority delegated by Congress to the President in the IEEPA to deal with an international emergency should be read as broadly as the statutory text and the Constitution will permit, and no limitations on it should be implied.

The President's power under the IEEPA to prevent the prosecution or adjudication of claims against Iran in the federal courts extends to any claim asserting an interest in property in which Iran has an interest, though it is unclear whether this would include a naked tort claim against Iran which did not otherwise involve the assertion of an interest in property.

June 25, 1980

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandun responds to two questions you have asked concerning the President's power under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.* (Supp. I 1977), to take action affecting pending litigation in the federal courts between U.S. nationals and the Republic of Iran. The two questions are the following: (1) Does IEEPA empower the President to order the federal courts to stay these pending cases? (2) Short of taking direct action with respect to the courts, may the President direct the litigants themselves to take no further action with respect to these cases?

As you know, under the authority conferred by IEEPA, the President has already prohibited the unauthorized transfer of Iranian government property subject to U.S. jurisdiction. Moreover, the regulations implementing the President's order provide expressly that the general prohibition against transfer of Iranian property will extend to legal proceedings. The regulations prevent the transfer of Iranian property or the creation of interests in Iranian property through the operation of civil process. They do this in two ways. First, as a matter of substantive property law, they provide that during the life of the blocking order no interest can be created in Iranian property through the operation of

236

civil process (through the entry of judgment, for example). *See* 31 C.F.R. §§ 535.203, 535.310. Second, as a matter of procedure, they prohibit the filing, issuance, or entry of judicial process in some cases,[1] and they invoke the civil and criminal penalties prescribed in IEEPA for any violation of this apparent proscription. *See* § 535.701.

Significantly, these regulations contain a special authorization that exempts the prejudgment elements of most domestic civil litigation from the procedural prohibition to which we have just referred. *See* § 535.304. For purposes of the regulations, the effect of this authorization is to permit litigation to go forward even where it might otherwise involve acts prohibited by the regulations—i.e., acts undertaken with the purpose or intent of creating interests in Iranian property. *See* § 535.310.[2] The exemption does not, however, authorize final judicial action or process of the kind that ordinarily creates interests in property (entry of judgment, etc.); nor does it authorize any judicial proceeding or any part of any judicial proceeding that is "based on" an economic or financial transaction that was in violation of the blocking order. *See* § 535.504(b).

Your inquiry, in essence, is (1) whether the existing regulations are lawful to the extent that they already prohibit litigation involving Iranian property and (2) whether they can be amended to create a legal bar to further litigation during the life of the blocking order, to the extent that they presently permit litigation to go forward under the general authorization we have just described. Our conclusions are (1) that the regulations are lawful to the extent that they now prohibit litigation involving Iranian property, (2) that they could be amended to prohibit what they now permit, and (3) that the amendment could take either of two forms: it could set forth a rule to be applied by the federal courts restricting their jurisdiction to proceed with the adjudication of claims with respect to Iranian property during the life of the blocking order, or it could impose a rule prohibiting claimants from proceeding further with the prosecution of these claims. The reasons for our conclusions are set forth below.

---

[1] *See* §§ 535.201, 535.310. The procedural prohibition is cast in terms of a prohibition against the *transfer* of Iranian government property, *see* § 535.201; but the term "transfer" is defined so broadly that it covers any "act" the "purpose, intent, or effect of which" is to create any "interest" in Iranian property, directly or indirectly. The regulations catalogue the kinds of acts that may fall within the prohibition, and in that connection they refer expressly to the filing, issuance, or entry of judgments or other judicial process. *See* § 535.310. Accordingly, we interpret the general prohibition against "transfer" of Iranian property as a prohibition against filing, issuance, or entry of any judicial process where the purpose, intent, or effect of the act is to create an interest in Iranian property. Whether the general prohibition could be interpreted in its present form to prohibit litigants from filing or prosecuting *claims* against Iranian property, we cannot say.

[2] This "authorization" does not purport to authorize litigation, process, or acts with respect to Iranian property that are prohibited by other statutes or laws. *See, e.g.,* 28 U.S.C. §§ 1609, 1611. These provisions of the Foreign Sovereign Immunities Act (FSIA) preclude prejudgment attachment of the property of a foreign sovereign unless the purpose of the attachment is *not* to obtain jurisdiction and the foreign sovereign has explicitly waived immunity from attachment prior to judgment. The IEEPA regulations have not been interpreted as overriding FSIA.

The relevant statutory language is found in § 203(a)(1)(B) of IEEPA. *See* 50 U.S.C. § 1702(a)(1)(B). Under that subsection the President may, upon a declaration of national emergency, "investigate, *regulate,* direct and compel, nullify, void, *prevent* or *prohibit,* any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or *exercising any right, power,* or *privilege with respect to,* or transactions involving, *any property in which any foreign country* or a national thereof *has any interest;* by any person, or with respect to any property, subject to the jurisdiction of the United States." This language was lifted without alteration from § 5(b) of the Trading with the Enemy Act. *See* 50 U.S.C. App. § 5(b)(1)(B). It has a long statutory history.

It is evident that the core of the President's power under IEEPA is his power to block or regulate commercial transactions in which foreign nationals have an interest. But the words themselves indicate rather clearly that Congress intended to confer on the President the power to regulate things other than the mere transfer of foreign property or the creation of interests in foreign property. He may, for example, prohibit or regulate the "exercise of any right, power or privilege" with respect to foreign property; and because the language of the subsection is disjunctive in character, this power is one that he may exercise in addition to his power to regulate, for example, the creation of interests in foreign property, or the use of foreign property, or the transfer of title or possession. Congress has determined that in time of emergency the exercise of rights or privileges with respect to foreign property may create dangers or difficulties that cannot be met by a simple prohibition against transfer or use, and Congress has given the President power to deal with those dangers.[3]

Does IEEPA give the President power to regulate judicial proceedings? IEEPA does not refer expressly to judicial proceedings, but its language is very broad. Of the "rights" and "privileges" that can be exercised "with respect to" foreign property, none is more important than the privilege of asserting a legal claim with respect to foreign property in court—the privilege of demanding and receiving an adjudication of property rights that carries the force of law. If, during an emergency, the President concludes that such a demand or such an

---

[3] The language of IEEPA indicates that the President's power under the statute is not plenary. IEEPA expressly denies him power to regulate mere "personal communications" not involving a transfer of "anything of value." 50 U.S.C. § 1702(b)(1). We know of no judicial decision that construes this language, but on its face it imposes a limitation on the President's authority to regulate transactions that do not involve an actual transfer of property having value. The relevant legislative history is not illuminating. *See, e.g.,* S. Rep. No. 466, 95th Cong., 1st Sess. 5 (1977). We do not construe this language as affecting any power that the President might otherwise have under IEEPA to regulate or prohibit the exercise of rights and privileges with respect to property through the assertion of formal claims in court. In our view, the prosecution of a civil claim is not a mere "personal communication" in the sense intended by the statute.

adjudication may create a danger related to the emergency that cannot adequately be met by a simple prohibition against the transfer of the property in question, we think that IEEPA gives him power to deal with that danger. If the words mean what they say, the power to regulate or prohibit the prosecution or adjudication of court claims with respect to foreign property is surely within the ambit of the President's larger power to regulate the exercise of rights and privileges "with respect to" foreign property in the first instance.[4] Moreover, in the context of the present Iranian crisis, this argument carries force. The President may well conclude that ongoing litigation involving claims to Iranian property will weaken his hand in dealing with the crisis and that the litigation may create difficulties that cannot be prevented through the simple expedient of prohibiting new entries on the judgment docket. As the litigation progresses, as motions and defenses are allowed or dismissed, as evidence is developed and heard, the present uncertainty regarding rights and liabilities with respect to Iranian property subject to U.S. jurisdiction will diminish. Yet uncertainty can be valuable in international negotiation. If the President decides that uncertainty should be preserved, he may decide that the litigation should come to a halt.

Our task is to determine whether the textual argument is decisive. It is a difficult task. To accept the argument—to read the language as broadly as it might be read—is to accept the proposition that Congress has delegated to the President extraordinary authority to suspend for the time being the operation of a co-equal branch of government in a certain class of cases. We do not doubt that Congress itself has power to do this either by barring the prosecution of these claims during the period of emergency or by restricting temporarily the power of the courts to decide them. But it is another matter entirely to contend and conclude that this slender statutory text confers such power upon the President. Putting IEEPA to one side, we can think of no instance in which Congress has delegated to the President or any other executive officer authority to make discretionary judgments that can affect the jurisdiction of the courts or the rights of litigants in precisely this way.

Our caution notwithstanding, two considerations lead us to conclude that the President's express authority under IEEPA to regulate or prohibit the exercise of rights or privileges with respect to foreign property should *not* be subjected as a matter of interpretation to an implied limitation that would prevent the President from regulating the

---

[4] The textual argument is strengthened by the fact that IEEPA expressly preserves to some extent the power that the President enjoyed under § 5(b) of the Trading with the Enemy Act to create "definitions, not inconsistent with the purposes" of the statute, for "any and all terms used" in the statute. Under IEEPA the President is expressly given power to issue regulations, "including regulations prescribing definitions," necessary for the exercise of the "authorities" granted by the statute. *See* 50 U.S.C. § 1704. The predecessor language was construed by the Supreme Court as requiring that the President's emergency power "be given generous scope to accomplish its purpose." *Propper* v. *Clark,* 337 U.S. 472, 481 (1949); *see* 42 Op. Att'y Gen. 363,366 (1968).

exercise of rights and privileges with respect to foreign property in court. Those considerations are the following:

First, when Congress enacted IEEPA, it was well aware of the long and creative history of the predecessor statute, the Trading with the Enemy Act. That statute had been used repeatedly for new and important purposes, wherever and whenever its broad and unqualified language would permit new action to be taken.[5] Moreover, when Congress reexamined that history and fashioned IEEPA, it had before it an administrative interpretation that bore upon the very issue that concerns us here—the President's power to regulate judicial proceedings. The Cuban Assets Control Regulations, for example, which had been in place since the early 1960's, contained provisions that purported to prohibit some kinds of judicial proceedings. *See* 31 C.F.R. §§ 515.201(b)(1), 515.310, 515.504(c), 515.504(d). Congress chose to preserve without alteration the statutory language upon which those regulations had been based. Although the relevant legislative history discloses no active consideration of the question of judicial proceedings per se, Congress was well aware of the precedents.[6] In the legislative actions surrounding the enactment of IEEPA, we find no evidence of an intention to reverse this administrative interpretation or to restrict the President's authority on this point.

The second consideration is jurisprudential in nature. The Supreme Court has consistently recognized that in the field of foreign affairs there are compelling reasons for vesting generous discretionary power in the President. He is the "sole organ of the federal government in the field of international relations;" and, with respect to the question of delegated power, "[it] is quite apparent that if, in the maintenance of our international relations, embarrassment—perhaps serious embarrassment—is to be avoided and success of our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).

This oft-quoted language was adopted by the Court in a case very much like the present one. The question was whether the President could lawfully take action under a broad delegation from Congress to impose and preserve a rule of law (a prohibition against the sale of arms) upon which a pending judicial proceeding (the proceeding below) had been founded. The question was treated as one of constitu-

---

[5] *See Emergency Powers Statutes,* S. Rep. No. 549, 93d Cong., 1st Sess. 184-91 (1973).

[6] The House committee that considered IEEPA compiled an extensive documentary history for use in connection with its hearings which included ,these regulations. *See Trading with the Enemy: Legislative and Executive Documents Concerning Regulation of International Transactions in Time of Declared National Emergency,* Subcomm. on International Trade and Commerce of the House Comm. on International Relations, 94th Cong., 2d Sess. (Comm. Print 1976).

tional dimension under the delegation doctrine, but we think that the Court's observations about the necessary relation between legislative and executive power in the field of foreign affairs are directly relevant to the question of statutory interpretation in the first instance. If Congress delegates power broadly to the President to deal with an international emergency, there is no prudential reason to read the delegation more narrowly than the words and the Constitution will permit. On the contrary, there are reasons to read the delegation broadly. Congressional legislation must often accord the President "discretion and freedom from statutory restriction" to deal with foreign affairs—a "discretion and freedom" that would be inadmissible were domestic affairs alone involved.

We think that this principle should be followed in the interpretation of IEEPA. In point of fact, under the predecessor statute the courts consistently recognized the unusual breadth of the power that these few, plain words delegated to the President. The courts refused to recognize implied limitations. *See, e.g., Smith* v. *Witherow,* 102 F.2d 638 (3d Cir. 1939); *Ruffino* v. *United States,* 114 F.2d 696 (9th Cir. 1940); *Pike* v. *United States,* 340 F.2d 487 (9th Cir. 1965); *Sardino* v. *Federal Reserve Bank of New York,* 361 F.2d 106 (2d Cir. 1966). Accordingly, although we have not found a case on point either under the old statute or the new, we are not inclined to recognize implied limitations here. We are of opinion that the President's power to regulate or prohibit the exercise of rights, powers, or privileges with respect to foreign property, must be read to include a power to regulate or prohibit the exercise of rights, powers, or privileges through the prosecution or adjudication of claims with respect to foreign property in court—a power that he may exercise in addition to his power to prevent the transfer of, or the creation of interests in, foreign property.

## II.

Precisely what kinds of claims are a proper subject for presidential regulation under IEEPA? Under the statute, they must be claims exercising a right, power, or privilege "with respect to . . . property" in which Iran or an Iranian national has an "interest." The key words are "property" and "interest." The presence of "property" or an "interest" in property triggers the power to act. In the absence of "property" or an "interest" in property, the statute confers no power. We are prepared to read this language broadly, but in the end the International Emergency Economic Powers Act does not confer plenary power upon the President to regulate all things foreign.

In accordance with that principle, we think that the President's power to prevent the prosecution or adjudication of claims against Iran in the federal courts extends to any claim asserting an interest in or under an account or other specific property in which Iran has an

241

interest. Moreover, it seems to us that the assertion of a claim against Iran, whatever its legal basis, will be tantamount to the assertion of a claim "with respect to" Iranian property whenever (1) the underlying obligation is secured by Iranian property under contract or by law, or (2) the viability of the claim in court depends upon the assertion of an interest in Iranian property (as in the case of a claim asserted pursuant to a jurisdictional attachment).[7] It might even be possible to read the statute broadly to permit the regulation of claims of debt asserted without reference to any extraneous property interest. Instruments of debt (bonds, notes, etc.) are the "property" of the claimant, and they are also property in which the obligor (Iran) has an "interest" in a general sense. Finally, if the language of the statute can be given a broad construction, nonetheless we think it cannot be read as a general grant of authority to control every conceivable instance of domestic litigation with Iran. For example, we think it unclear that the assertion or adjudication of a naked tort claim against Iran could itself be considered an exercise of a right, power, or privilege with respect to "property" in which Iran has an "interest;" and we doubt that the proceeding in which the claim is asserted could itself be regarded, without more, as a transaction "involving" property within the meaning of the statute. The President would of course have power to prevent foreign property from being transferred to satisfy the underlying claim, to satisfy any judgment that might be rendered in the case, and to prevent the entry of any judgment from creating an interest in property as a matter of law. But if the President exercised that power and the claim itself involved no actual assertion of rights or privileges with respect to property, in our view it would be difficult to find in the statute a basis for further presidential action.

## III.

We wish to emphasize, again, that our interpretation of the statute is based not upon any judicial decision discussing or deciding the question at issue, but upon what we believe to be a reasonable reading of the statutory language in light of the relevant historical and jurisprudential considerations. The decisive consideration, in our view, is the one that we have already mentioned: Congress has given the President power to do more than prevent the use or transfer of foreign property during the pendency of a national emergency. Congress has contemplated that the mere exercise of rights, powers, or privileges with respect to foreign property may create dangers that cannot be met by a prohibition

---

[7] *See* note 2 *supra.*

against transfer or use; and Congress has given the President power to deal with those dangers.

LARRY A. HAMMOND
*Acting Assistant Attorney General*
*Office of Legal Counsel*
