**TRAN QUI THAN, Plaintiff,**

v.

**W. Michael BLUMENTHAL, Defendant.**

**No. C–77–1361–WWS.**

United States District Court,
N. D. California.

April 27, 1979.

Mattaniah Eytan, Kirkwood, Kaplan, Russin & Vecchi, San Francisco, Cal., for plaintiff.

Dennis L. deLeon, U. S. Dept. of Justice, Washington, D. C., John D. O'Connor, Asst. U. S. Atty., San Francisco, Cal., for defendant.

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WILLIAM W SCHWARZER, District Judge.

Section 500.201 of the Foreign Assets Control Regulations ("Regulations"), 31 C.F.R. Part 500, prohibits, except upon specific authorization by the Secretary of the Treasury, transactions involving United States based property in which a designated foreign country or a national thereof has an interest. South Vietnam is a designated foreign country. Plaintiff, a shareholder in a South Vietnam bank, the Dong Phuong Bank ("Bank"), claims an interest in funds owed by the United States Government to the Bank. The Secretary of the Treasury has ruled that the Bank is a "designated national" and that the funds are therefore blocked pursuant to the Regulations, and has refused to issue an unblocking license. The parties' cross-motions for summary judgment raise two issues. First, did the Secretary err in determining that the Bank is a designated national and therefore subject to the Regulations' blocking provisions? Second, did the Secretary err in not issuing a license unblocking the funds owed to the Bank?

### I. Statement of Facts

The Dong Phuong Bank was a private commercial bank established in 1968 under the laws of the Republic of Vietnam. As of April 30, 1975, when South Vietnam fell to the communist forces, a small group of shareholders owned the Bank's stock. All the shareholders were nationals and residents of Vietnam. The Bank's 11 directors owned more than 80 percent of the outstanding shares. Plaintiff was the principal shareholder, owning 13 percent of the outstanding shares, and served as a director and as president of the Bank.

Plaintiff fled Vietnam on April 25, 1975, and currently resides in Berkeley, California. He entered the United States as a refugee with parole status granted by the Attorney General under Section 1182(d)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1182(d)(5). Of the eleven shareholder-directors, seven left Vietnam in anticipation of the communist takeover, one remained in Vietnam, one was captured and imprisoned while attempting to leave Viet-

nam, and the fate of the remaining two shareholder-directors is unknown. The three shareholder-directors known to be residing in the United States (plaintiff and two others) account for 18 percent of the Bank's stock; those in France and Hong Kong hold 38 percent; those known to be in Vietnam hold 30 percent; and those whose location is unknown hold 14 percent.

On April 15, 1975, the shareholder-directors met to consider what action they should take in light of the impending fall of Vietnam. They adopted a resolution providing that those members of the management board "who will be able to leave the country will be qualified to manage and to make use of all the . . . properties that the [Bank] possesses abroad." This resolution was to be "enforced beginning the day when . . . Saigon . . . will be occupied by the Communist government."

Saigon fell and resistance ended on April 30, 1975. On May 1, the Provisional Revolutionary Government of Vietnam ("P.R.G.") issued a communique directing that "banks . . . will be confiscated and from now on, managed by the revolutionary administration." Plaintiff maintains that the Bank was confiscated and destroyed on April 30, and that the communique confirmed this fact. Defendant argues that the Bank continued to function until August 1975. It is undisputed, however, that the Bank, in whatever form it may currently exist, and its assets are now controlled by the P.R.G.

As of April 30, 1975, the Bank was the assignee of monies owed to certain Vietnamese contractors under several construction, maintenance, and supply contracts with the United States Army and Navy. The assignments were made in consideration of the issuance of performance bonds, running to the benefit of the United States, guaranteeing performance by the Vietnamese contractors, and in consideration of the loan of working capital to the Vietnamese contractors. The contractors had entirely performed their contracts before the fall of Vietnam; however, on that date, the United ed States still owed a residual sum to each contractor. The contractors have since come to the United States as parolee-refugees.

At an unspecified time after arriving in the United States, plaintiff sought payment from the Army of the $221,235 which it owed under the contract. The Army refused to make this payment, stating that the money was blocked pursuant to Section 500.201 of the Regulations, and that to receive the funds it was necessary to obtain a license from the Secretary of the Treasury. At another unspecified time, plaintiff signed a release on behalf of the Bank of the Bank's claims as assignee of the sum due from the Navy. The Navy then paid $49,965 to Tran Ngoc Tuan, one of the Vietnamese contractors now residing in the United States, which represented the total amount due under the contracts with the Navy. He in turn paid $29,975.44 to plaintiff.

On December 22, 1976, plaintiff applied to the Treasury Department's Office of Foreign Assets Control for a license to unblock the sum owed to the Bank by the Army. On February 22, 1977, the Office of Foreign Assets Control, acting on behalf of the Secretary of the Treasury, denied plaintiff's application, giving the following reasons:

> The Dong Phuong Bank, a Vietnamese corporation, is a designated national under the Regulations. The Regulations prohibit, in the absence of a Treasury license, all transactions involving assets in the United States in which a Vietnamese national has, or has had on or since April 30, 1975, any interest whatsoever. On April 30, 1975, the Bank had an interest in the funds due under all contracts which had been assigned to it. This interest could not be transferred after April 30, 1975, without a license from this Office.

The letter of denial also stated that the sums already paid by the Navy were blocked under Section 500.201 and contained subpoenas requesting information about these payments.

Plaintiff filed the instant action on June 23, 1977. As amended, the complaint seeks a declaration that the Foreign Assets Control Regulations are inapplicable in this case, there being no "designated national" having an interest in the funds, and that the funds due from the Navy and the Army thus may not properly be blocked. Alternatively, if the Court finds that there is a designated national with an interest in the funds, the complaint seeks declaratory relief requiring defendant to issue a license unblocking the funds. Plaintiff has been authorized by the shareholder-directors known to have left Vietnam to assert their interests as well in this action.

## II. *Capacity to Sue*

■ Defendant has challenged plaintiff's capacity to sue on the ground that Tran is not the real party in interest. Fed.R.Civ.P. 17(a) states that "[e]very action shall be prosecuted in the name of the real party in interest." But Rule 17(a) also states:

No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Plaintiff has brought this action, on behalf of himself and other shareholders, as a shareholder of a Vietnam bank, the present legal status of which is unsettled. Plaintiff asserts that as a result of certain events, he now has an interest in funds owed to the Bank by the United States Government. Plaintiff's claims thus make him a real party in interest. Moreover, neither ratification by the Bank nor its substitution or joinder as plaintiff is feasible. Defendant will suffer no prejudice for there is no reason why he cannot assert against plaintiff any defenses which he could have asserted against the Bank; plaintiff can claim a share only of assets to which the Bank

had a rightful claim. Defendant's motion to dismiss for lack of capacity must therefore be denied.

## III. *Scope of Review*

■ Judicial review of the action of the Secretary of the Treasury, acting through the Office of Foreign Assets Control, is authorized by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* Section 706 defines the scope of review in this Court:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) * * *

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

These standards apply except when an adjudicatory hearing is required, in which case the administrative record is reviewed under a "substantial evidence" standard. (§ 706(2)(E)). In the present case, no act or regulation requires an adjudicatory hearing. Section 500.801(b)(3) of the Regulations states that an applicant for a special license may arrange to make an "oral presentation" or elect to "argue the application." Plaintiff did not request an oral presentation or argue the application. Review of the Secretary's decision is thus limited in scope by the powers of review granted in the preceding provisions of Section 706.

## IV. *The Classification of the Dong Phuong Bank as a Designated National*

■ Plaintiff argues that the Secretary of the Treasury determined incorrectly that

the Bank is a designated national whose United States based funds are subject to blocking under the Foreign Assets Control Regulations.

One statute and three provisions of the Regulations form the basis for the Secretary's decision. As of February 1977, Section 5(b) of the Trading with the Enemy Act, 50 U.S.C. App. § 5(b), provided that during war or any period of national emergency the President may prohibit "transactions involving any property in which any foreign country or a national thereof has any interest." Section 500.201 of the Foreign Assets Control Regulations, promulgated under the Act and applicable here, bars transactions (unless specifically authorized by a license) that "involve [U.S. based] property in which any designated foreign country, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect." The "effective date" is the date when the country is listed as a designated foreign country. Under Section 500.302, the term "national" includes a citizen of a designated foreign country and a corporation organized under the laws of the designated country "or which on or since . . . [the] effective date was or has been controlled by . . directly or indirectly, a [designated] foreign country and/or one or more nationals thereof." Under Section 500.305, the term "designated national" includes all individuals and corporations previously defined as "nationals."

On their face, the Regulations apply to the Dong Phuong Bank as the Secretary has determined. South Vietnam was classified as a designated country at 12:00 p. m. Eastern Daylight Time on April 30, 1975. By virtue of having been organized under the laws of Vietnam, the Bank became a national, and, in turn, a designated national, on that date. Because the Bank held an interest as of April 30, 1975, in the funds due from the United States Government, this interest became blocked and could not be transferred without a license.

Plaintiff does not dispute that the Regulations, so interpreted, apply to block the transaction at issue here. But he argues that two events—the April 15, 1975, shareholder-directors' resolution and the pre-effective date seizure of the Bank by the P.R.G.—render the Regulations inapplicable.

A. *April 15 Shareholders' Resolution*

The April 15, 1975, resolution of the shareholder-directors provided in pertinent part:

Accordingly, the Management Board decides that those among the Management Board members who will be able to leave the country will be qualified to manage and to make use of all the accounts of the Dong Phuong Bank in banks located out of Vietnam as well as all the properties that the Dong Phuong Bank possesses abroad.

\* \* \* \* \* \*

The present decision will be enforced beginning the day when the Saigon metropolis will be occupied by the Communist government.

Tran maintains that the resolution was intended to dissolve the portion of the Bank existing in Vietnam, to preserve the de facto existence of the corporation outside Vietnam, and to transfer the interest in the Bank's foreign assets to shareholder-directors who escaped from Vietnam. According to plaintiff, the Bank could therefore not have been classified by the Secretary as a designated national.

The denial letter of February 22, 1977, rejected this claim:

The actions of the shareholders and directors of the Bank described in the Application were ineffective to dissolve it or transfer its assets. The Resolution signed by the directors of the bank ten days prior to the fall of Viet-Nam stated that its intent was to allocate management and control of the United States assets of the Pank to the shareholders who left Saigon prior to its fall. The Resolution did not even purport to transfer the bank's interest in the United

States assets to these shareholders. Further, no evidence has been submitted in support of the assertion that the Resolution effected a valid dissolution of the corporation under the laws of South Viet-Nam. Accordingly, there was neither a dissolution nor a transfer made prior to April 30, 1975, of the Bank's interest in the funds to the shareholders who left Viet-Nam.

The Secretary's interpretation of the resolution cannot be said to be arbitrary, capricious, an abuse of discretion, or contrary to law. By its own terms, the resolution did no more than allocate management and control of the Bank's foreign assets, contingent upon the fall of Saigon. It mentioned nothing about a dissolution of the Bank, a change in its domicile, or a transfer of its assets. Plaintiff states that in the chaotic and dangerous situation during the final days of the Republic of South Vietnam, that resolution came as close to dissolving the corporation as the shareholders dared come. Plaintiff does not contend, however, that the resolution was sufficient under Vietnamese law to dissolve the Bank or transfer any of its assets to the shareholders; indeed, such a dissolution or transfer would, according to plaintiff, have been illegal under Vietnamese law.

### B. *Seizure of the Bank by the P.R.G.*

Plaintiff contends that the Bank was seized and destroyed as an entity upon the fall of Saigon shortly before the Regulations became effective as to South Vietnam. It is his position that the Bank was merged into the National Bank of Vietnam immediately upon its seizure, and that it never again functioned, either as a private bank or as a government-managed corporation, independent of the National Bank of Vietnam. Because the Bank ceased to exist prior to the "effective date," plaintiff argues, it never had an "interest" in the funds, which therefore never became subject to the blocking provisions of the Regulations.

Plaintiff has submitted affidavits stating that the Bank did not function after April 30, 1975, along with the May 1 communique from the P.R.G. which ordered the confiscation of all banks. Defendant responds that the May 1 communique did not "merge" the Bank into the National Bank but merely announced that the Saigon Military Management Committee assumed direction of all banks. He agrees that the P.R.G. ordered all private banks to close their doors to customers on April 30 or May 1, 1975, but not that they ceased to exist on that date. On August 30, 1975, according to defendant's interpretation of two communiques from the P.R.G., the P.R.G. ordered private banks (specifically including the Dong Phuong Bank) to reopen for a period of two months and settle their accounts with depositors and shareholders; after the two-month period, the banks were to close, with the National Bank of Vietnam assuming control over the country's banking services. Defendant argues that the expropriation and merger of the private banks did not occur until after this two-month period had elapsed.

Because the parties did not present this evidence to the Secretary, he did not address this issue in his letter of denial. However, the issue raised by plaintiff is not material to the resolution of this case. Under either interpretation of the evidence, the Regulations are applicable. Under the facts offered by the government (i. e., that the Bank continued operations after the effective date, albeit under P.R.G. direction), the Bank is a designated national with an interest in the funds owed by the United States Government. The funds may therefore be blocked. Under the factual situation presented by plaintiff (i. e., that the P.R.G. destroyed the Bank and seized its assets prior to the effective date), the P.R.G. directly or indirectly became the successor-in-interest to all the Bank's claims. The Regulations prohibit transactions in property in which a designated foreign country has had an interest since the effective date.

For the purpose of this summary judgment motion, the Court will consider the facts in the light most favorable to plain-

tiff. Assuming, therefore, that the Bank as an entity ceased to exist before the effective date, its assets, having been taken over by the P.R.G., were clearly subject to being blocked. Plaintiff admits that had the Bank carried on business after the effective date, the funds in dispute could properly be blocked. *Nielsen v. Secretary of Treasury*, 137 U.S.App.D.C. 345, 424 F.2d 833 (1970). Plaintiff attempts to distinguish the present case from *Nielsen* in that the bank was not a functioning corporation on the effective date. But a fund belonging to a bank expropriated by Vietnam surely qualifies as "property in which any designated foreign country, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect." 31 CFR § 500.201. A government with the power to expropriate also has the power to assert a claim as the successor to an expropriated bank's foreign-based assets. It is clear, therefore, that the mere fact of expropriation by Vietnam prior to the effective date does not distinguish this case from *Nielsen*.

## V. The Refusal to Issue a License Unblocking Funds

Plaintiff argues further that, in any event, the Secretary erred in not issuing a license unblocking the Bank's United States based assets. In plaintiff's view, the Secretary's failure to issue a license conflicts with the territorial limitation of the act of state doctrine, and plaintiff's constitutional and treaty rights.

## A. Effect of the Territorial Limitation of the Act of State Doctrine

■ Tran argues that the territorial limitation of the act of state doctrine bars any claim to the United States based assets derived through the expropriation of the Bank. Inasmuch as no designated country or national could therefore have acquired an interest, no legal basis exists for blocking these assets.[1]

The classic statement of the act of state doctrine, quoted in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), appears in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):

> Every sovereign State is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

■ The Court in *Sabbatino, supra*, 376 U.S. at 428, 84 S.Ct. at 940, explained that "the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government . . . even if the complaint alleges that the taking violates customary international law." This forbearance on the part of American courts does not extend, however, to property in the United States which a foreign government attempts to take without compensation. " 'Our courts will not give "extra-territorial

1. Although plaintiff has not fully articulated it, the logical extension to his argument is that application of the Regulations to the assets of a corporation expropriated before the effective date is improper for it is not within the scope of the authorizing statute, Section 5(b) of the Trading with the Enemy Act, *supra*. But that Act grants broad powers to the President. Regulations issued pursuant to the Act are valid if they carry out a purpose of the authorizing statute. *See Ruiz v. Morton*, 462 F.2d 818, 822, (9th Cir. 1972), *aff'd.*, 415 U.S. 199 (1974). The purposes articulated for blocking under the Act include (1) keeping hard currency away from certain countries, *Veterans & Reservists for Peace in Vietnam v. Regional Commissioner*, 459 F.2d 676 (3d Cir. 1972) and (2) preserving assets for future claims satisfaction, *Nielsen v. Secretary of Treasury, supra*, 424 F.2d 833. See Sommerfield, "Treasury Regulations Affecting Trade With the Sino-Soviet Bloc and Cuba," 19 The Business Lawyer 861 (1964). While the Secretary does not contend that Tran might turn the blocked assets over to Vietnam, he does contend that blocking advances the purposes of the statute by preserving assets in which Vietnam may assert an interest for future claims satisfaction.

effect" to a confiscatory decree of a foreign state, even where directed against its own nationals.' " *Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021, 1025 (5th Cir.), *cert. denied*, 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972), quoting *F. Palico y Compania, S. A. v. Brush*, 256 F.Supp. 481, 488 (S.D.N.Y.1966), *aff'd mem.*, 375 F.2d 1011 (2d Cir. 1967).

■ On the strength of the territorial limitation, plaintiff argues that neither Vietnam, nor anyone whose claim derives from the confiscation by the P.R.G., would be able to recover in the United States courts the sums claimed by Tran because those courts would refuse to honor that confiscation with reference to United States based assets. *Maltina Corp. v. Cawy Bottling Co., supra; Tabacalera Severiano Jorge, S. A. v. Standard Cigar Co.*, 392 F.2d 706 (5th Cir.), *cert. denied*, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968). But that, of course, is not the question before the Court. Vietnam is not a party to this action, and the validity of the confiscation is not in issue. What Tran seeks to do here is to convert a shield against the enforcement of claims derived from foreign expropriation into a sword to frustrate the marshalling by the Executive Branch of assets to which a foreign government may lay claim in the future. In the territorial limitation cases, the courts have refused to give effect to confiscations in resolving disputes over ownership between the original owners and a party claiming through the confiscation. The question in those cases was whether a foreign government, or its assignee, would be able to enforce a confiscatory decree within the United States against United States based assets. Here no such issue arises, for the Court does not decide who will be entitled to the funds.

In answer, Tran argues that Vietnam would be getting the benefit of its confiscation of the Bank if the blocked assets are used in any claims settlement; Vietnam would in effect be paying the claims of American citizens with blocked United States based funds, instead of using money from its treasury. But there is no way for this Court to know what, if any, claims settlement arrangements may be made in the future. This is a matter in the hands of the President and Congress. Speculation on possible savings to Vietnam's treasury therefore affords no basis for this Court to rule that the territorial limitation principle requires the Secretary to unblock the claimed funds.

### B. *Constitutional Claims*

■ Tran further contends that the Secretary's blocking action amounts to a governmental taking without compensation. That contention must be rejected. Blocking is by its nature only a temporary action. Neither the Bank nor Tran has been divested by United States Government action of whatever right, title or interest either may have.

Tran argues that the Secretary may block the funds indefinitely. The Court recognizes that an indefinite blocking, if it "effectively deprive[s] an alien of substantially all the benefit of his interest in property," ALI Restatement 2d, Foreign Relations Law of the United States § 192 (1965), could be a taking under international standards. But nothing before the Court indicates how long the funds may be blocked. Moreover, as the earlier discussion of the effect of the April 15 resolution shows, Tran has failed to establish that he and his fellow shareholders have a constitutionally protected property interest in the claims owned by the Bank.

In an effort to establish an ownership claim, plaintiff points to decisions in which courts have pierced the corporate veil to recognize equitable claims of shareholders to corporate assets. See *Kaufman v. Societe Internationale*, 343 U.S. 156, 72 S.Ct. 611, 96 L.Ed. 853 (1952); *Pernikoff v. Kennedy*, 219 F.Supp. 854 (D.D.C.1963). These cases have no application here. In *Pernikoff*, the corporation was merely a shell or dry trust which existed for the benefit of its sole shareholder. And, as the court pointed out in *Nielsen v. Secretary of Treasury, supra*, 137 U.S.App.D.C. at 354–55, 424 F.2d at 842‑43, the issue in *Kaufman* arose in connection with the permanent disposi-

tion of alien property, not its preservation for future disposition. With respect to the latter, the broad sweep of the government's power was recognized in *United States v. Pink*, 315 U.S. 203, 228, 62 S.Ct. 552, 564, 86 L.Ed. 796 (1942), where the Court said:

> To be sure, aliens as well as citizens are entitled to the protection of the Fifth Amendment. *Russian Volunteer Fleet v. United States*, 282 U.S. 481, [51 S.Ct. 229, 75 L.Ed. 473]. A State is not precluded, however, by the Fourteenth Amendment from according priority to local creditors as against creditors who are nationals of foreign countries and whose claims arose abroad. *Disconto Gesellschaft v. Umbreit*, 208 U.S. 570 [28 S.Ct. 337, 52 L.Ed. 625]. By the same token, the Federal Government is not barred by the Fifth Amendment from securing for itself and our nationals priority against such creditors. And it matters not that the procedure adopted by the Federal Government is globular and involves a regrouping of assets. There is no Constitutional reason why this Government need act as the collection agent for nationals of other countries when it takes steps to protect itself or its own nationals on external debts.

See also *Nielsen v. Secretary of Treasury, supra*, 137 U.S.App.D.C. at 358, 424 F.2d at 846.

2. The Secretary's action respecting assets of Cuban corporations primarily owned by American citizens was taken in response to Congressional direction:

> [T]he Committee on Foreign Relations recommends that upon application the Department of the Treasury examine with particular care each case involving Cuban assets beneficially owned by American citizens to determine whether those assets should continue to be blocked. In the committee's view, if the assets are wholly or substantially owned by citizens and residents of [the] United States they should be unblocked, since it is possible that such assets may be placed in a fund at some future date and used to pay the claims of American citizens against the Cuban Government. This would be tantamount to using the property of one U.S. citizen to pay the claim of another U.S. citizen.·

Senate Report 701, 1965 U.S.Code Cong. & Admin.News, pp. 3581, 3585.

■ Those same considerations also dispose of plaintiff's equal protection claim. The fact that the Secretary may in the exercise of his discretion unblock assets of corporations confiscated by the Cuban government and primarily owned by United States citizens does not render the instant blocking a violation of plaintiff's constitutional rights.[2] It cannot be said to be unreasonable for the Secretary to distinguish between claims by United States citizens and claims of nationals of the country whose government has confiscated their property. See *United States v. Pink, supra*.[3]

### C. *Other Contentions*

■ Plaintiff's other contentions are without merit. He invokes the provisions of the 1961 Treaty between the United States and the Republic of Vietnam which contain assurances that neither party shall take the property of nationals of the other without just compensation. T.I.A.S. No. 4890; 12 U.S.T. 1704 *et seq.*, Art. IV. These provisions, however, add nothing to the constitutional claims heretofore disposed of. Moreover, under principles of international law, the treaty has terminated since one of the contracting parties no longer exists.[4]

3. Those shareholders who do reside in the United States, including plaintiff, have been paroled into the United States under 8 U.S.C. § 1182(d)(5). In other contexts, courts have held that since a parole alien has not been "admitted" into the United States, he stands in the same shoes as an alien resident outside the United States. *Yuen Sang Low v. Attorney General of United States*, 479 F.2d 820 (9th Cir. 1973); *Siu Fung Luk v. Rosenberg*, 409 F.2d 555 (9th Cir. 1969).

4. ALI Restatement 2d, Foreign Relations Law of the United States § 159 (1965) states:

> § 159. Disappearance of State
> If a state that is a party to an international agreement ceases to exist as a state, the agreement is terminated as to it, but the state into which it is incorporated or the states into which it is divided succeed to its rights and obligations under the agreement to the extent that
> (a) the agreement defines the boundaries of the territory of the former state, or

**1212**

*Perry v. United States*, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935), holding that the United States could not abrogate its obligation to repay its bonds in gold, is not on point. The United States has not repudiated its obligation to the Bank. It has simply blocked transactions involving that obligation to permit eventual resolution of the various potential claims.

### Conclusion

For the reasons stated, the Court concludes that the actions of the Secretary in blocking the United States based assets of the Bank and declining to issue an unblocking license were within his authority. Accordingly, defendant is entitled to summary judgment.

IT IS SO ORDERED.

(b) the agreement relates to the use of the territory or its natural resources.
Illustration 1 to § 159:
State A and B enter into an international agreement regulating customs duties on their trade with each other. Subsequently B is annexed by state C. The annexation terminates the agreement between A and B.