TOLE S.A. and Compania Anomina De
Inversiones Venam, Plaintiffs,

v.

G. William MILLER, as Secretary of the
Treasury of the United States,
Defendant.

80 CIV. 0250 (CBM).

United States District Court,
S. D. New York.

Dec. 10, 1981.

**1000**

Conboy, Hewitt, O'Brien & Boardman, New York City, by Timothy C. Quinn, New York City, for plaintiffs.

John S. Martin, Jr., U. S. Atty., New York City, by Harvey J. Wolkoff, Asst. U. S. Atty., New York City, for defendant.

## OPINION

MOTLEY, District Judge.

The instant action is a challenge by two foreign corporations to the Secretary of the Treasury's refusal to unblock certain American-based assets of a Cuban corporation, Compania Petrolera Trans-Cuba (Trans-Cuba), in which plaintiffs are stockholders. Plaintiffs seek an order of mandamus requiring the Secretary of the Treasury to release their pro rata shares of Trans-Cuba's blocked assets or, in the alternative, a determination that the Secretary's blocking action is unconstitutional because it deprives them of their property without just compensation and violates the equal protection clause of the Fifth Amendment. Both parties have moved for summary judgment. For the reasons set forth below, defendant's motion for summary judgment is granted and plaintiffs' motion is denied.

The facts are stipulated for purposes of the cross-motions for summary judgment. Plaintiff Tole S.A. (Tole) is a Panamanian corporation whose stock is wholly owned by

Honduran nationals. *Stipulation of Facts (Stipulation)* ¶ 1. Plaintiff Compania Anomina de Inversiones Venam (CAIV) is a Venezuelan corporation whose stock is wholly owned by a Venezuelan national. *Stipulation* ¶ 2. Both plaintiffs have at all material times been stockholders in Trans-Cuba, a corporation organized under the laws of Cuba in June, 1955, for the purpose of exploring for oil deposits and developing oil concessions in the Republic of Cuba. *Stipulation* ¶ 3.

In May, 1960, Trans-Cuba was nationalized by the Castro regime, and all its property and assets were purported to be appropriated by the Cuban communist state. *Stipulation* ¶ 3. At the time it was nationalized, Trans-Cuba had approximately $1.8 million in assets on deposit in a New York bank. *Stipulation* ¶ 4.

On or about August 1, 1960, a Trans-Cuba stockholder, Honey Mann, brought suit against Trans-Cuba in New York State Supreme Court for the appointment of a receiver pursuant to then section 977–b of the New York Civil Practice Act[1] to prevent the Castro Government from expropriating Trans-Cuba's New York assets. *Mann v. Compania Petrolera Trans-Cuba*, 28 Misc.2d 434, 215 N.Y.S.2d 894 (Sup.Ct.1961). *Stipulation* ¶ 5. A temporary receiver was appointed on August 1, 1960. *Amended Stipulation* ¶ 1. On April 5, 1962, the State Supreme Court appointed a permanent receiver. A co-receiver was appointed on May 3, 1963. *Stipulation* ¶ 5.

On July 8, 1963, the Secretary of the Treasury (the Secretary) issued the Cuban Assets Control Regulations, 31 C.F.R. Part 515, under authority of Section 5(b) of the Trading with the Enemy Act, 50 App.U.S.C. § 5(b).[2] The Cuban Assets Control Regula-

---

**1.** The New York Civil Practice Act has since been repealed pursuant to § 10001 of the New York C.P.L.R.

**2.** Section 5(b)(1) of the Trading with the Enemy Act, prior to its amendment in 1977, granted to the President or any agency he designated, various powers to regulate foreign commerce "during the time of war or during any other period of national emergency declared by the

President." The President delegated the powers granted to him by this statute to the Secretary of the Treasury, 7 F.R. 1409 (1942). On October 15, 1962, the Secretary delegated the administration of foreign assets control regulations to the Office of Foreign Assets Control, Treas.Dept. Order 125. *See Sardino v. Federal Reserve Bank*, 361 F.2d 106, 109 n.2 (2d Cir.), *cert. denied*, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966).

tions (the Regulations) effected an immediate "blocking" by transfer of all American-based assets in which Cuba or any "designated national" thereof had an interest, direct or indirect, on the effective date of the Regulations. 31 C.F.R. § 515.201. A "designated national" is defined in the Regulations to include any "national" of Cuba, 31 C.F.R. § 515.305; a "national" is defined as including any corporation organized under the laws of a foreign country. 31 C.F.R. § 515.302(a)(2). Hence, under the Regulations Trans-Cuba was a "national" of Cuba, and thus a "designated national" whose American-based assets were immediately blocked. The Regulations provided that no blocked assets could be transferred without previously obtaining a "license" from the Secretary of the Treasury. 31 C.F.R. §§ 515.201(a), 515.316, 515.502.

On June 5, 1964, the Office of Foreign Assets Control transmitted a letter to the Trans-Cuba receivers ordering that no payments from Trans-Cuba's blocked assets, other than for certain administrative expenses, could be made without first securing a license from the Secretary. *Stipulation* ¶ 6. Thereafter, the receivers filed their report with the Supreme Court of the State of New York. By order of July 14, 1965, the state court appointed a referee to hear and determine various objections to the report that had been filed by certain stockholders and creditors of Trans-Cuba. *Stipulation* ¶ 7.

One of the questions before the referee, Judge Samuel C. Coleman, was whether the Regulations applied to Trans-Cuba's assets in light of the fact that the assets had been transferred to the receivers prior to the Regulations' effective date. The claimants contended that, since the Receivers had title and were not Cuban "nationals", all of Trans-Cuba's assets were free to be released, even to Cuban stockholders. The Government submitted to the referee its view that the Regulations applied to Trans-Cuba assets, the previous appointment of a

receiver notwithstanding. *Stipulation* ¶ 9. On January 19, 1967, the referee submitted his report to the State Supreme Court finding, *inter alia*, that the Regulations were applicable to Trans-Cuba's assets. *Stipulation* ¶ 10. The State Supreme Court adopted the referee's report, which was affirmed by the Appellate Division of the New York Supreme Court, *Mann v. Compania Petrolera Trans-Cuba*, 34 A.D.2d 775, 311 N.Y. S.2d 804 (1st Dept. 1970). By resettled order dated November 12, 1968, the referee directed the Comptroller of the State of New York, in his capacity as Abandoned Property Custodian, to take charge of the Trans-Cuba assets, and to hold them for distribution subject to the Regulations.

A portion of Trans-Cuba's assets were thereafter unblocked and distributed to certain individual shareholders, who had applied for and received a license pursuant to the Treasury Department's policy of providing for the pro rata distribution of the assets of Cuban corporations to certain United States citizens. The remainder of Trans-Cuba's New York assets remained blocked and in the possession of the State Abandoned Property Custodian.

In July, 1974, the Regulations were amended to issue licenses unblocking assets owned by partners and sole proprietors, whether American citizens or citizens of countries in "authorized trade territories",[3] 31 C.F.R. § 515.557, allowing them to obtain their pro rata shares previously frozen pursuant to the Regulations. 31 C.F.R. §§ 515.557, 515.558.

In August, 1974, and May, 1975, CAIV and Tole, respectively, filed applications with the Office of Foreign Assets Control seeking licenses to unblock their pro rata share of Trans-Cuba's New York assets. *Stipulations* ¶¶ 13, 14. Plaintiffs' applications were denied in September 1974, and July, 1975, respectively. *Stipulation* ¶¶ 13, 14.

In January, 1980, plaintiffs filed the instant action, seeking an order requiring the

---

**3.** "Authorized Trade Territory" is defined in the Regulations as including, *inter alia*, North, South, and Central America, including the Car-

ibbean region, except Cuba. 31 C.F.R. § 515.-322.

Secretary of the Treasury to release to them their pro rata shares of Trans-Cuba's assets.

## BACKGROUND OF THE CUBAN ASSETS CONTROL REGULATIONS

The Cuban Assets Control Regulations were promulgated by the Secretary of the Treasury on July 8, 1963, to prohibit all unlicensed financial and commercial transactions between residents of the United States and Cuba and its nationals. They were closely patterned on another set of Regulations, the Foreign Assets Control Regulations, 5 C.F.R. Part 500, which were issued in 1950 to block all assets in the United States belonging to Communist China and North Korea and their "nationals".[4] The Regulations were a direct response to the actions of the Castro regime which had, among other things, nationalized American-owned property in Cuba without paying compensation. *See, e.g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 403, 84 S.Ct. 923, 927, 11 L.Ed.2d 804 (1964); *Sardino v. Federal Reserve Bank,* 361 F.2d 106, 112 (2nd Cir.), *cert. denied,* 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966) (recognizing that the Regulations were issued because "Cuba has adopted a program expropriating property within its territory owned by designated American nationals"). These Regulations were the culmination of a policy that had begun with the Executive Branch's termination of diplomatic and consular relations with Cuba and the imposition of restrictions on travel to and from that country. 26 Fed.Reg. 492 (1961).

Subsequently, in the Foreign Assistance Act of 1961, 22 U.S.C. § 2370, Congress provided that no assistance be furnished under the Act to the Castro regime, and authorized the President to establish and maintain a total embargo upon all trade between the United States and Cuba. In February, 1962, such an embargo was proclaimed. Pres.Proc. No. 3447, 27 Fed.Reg. 1085 (February 5, 1962). Also issued in February 1962, were the Cuban Import Regulations, which prohibited imports into the United States of all goods of Cuban origin. In August, 1962, Congress enacted restrictions on the assistance to countries that furnished aid to the Castro regime. Act of August 1, 1962, 76 Stat. 260. Thereafter the Regulations under challenge in this action were issued by the Secretary of the Treasury.

In 1965, the Senate Foreign Relations Committee urged the Treasury Department to issue licenses to American citizen stockholders unblocking their proportionate shares of the blocked assets of Cuban corporations which were wholly or substantially owned by American stockholders on July 8, 1963. The Committee stated

> if the assets are wholly or substantially owned by citizens and residents of the United States they should be unblocked, since it is possible that such assets may be placed in a fund at some future date and used to pay the claims of American citizens against the Cuban Government. This would be tantamount to using the property of one U.S. Citizen to pay the claim of another U.S. citizen.

Quoted in *Nielsen v. Secretary of the Treasury,* 424 F.2d 833, 845–46 (D.C.Cir.1970). The recommendation was accepted by the Treasury Department, but it was not until 1974 that the Regulations were formally amended to reflect the policy change. 31 C.F.R. § 515.555. At the same time the Regulations were also amended to grant licenses to unblock the blocked assets of partners in Cuban partnerships and proprietors of Cuban proprietorships residing in authorized trade territories. 31 C.F.R. §§ 515.557 and 515.558.

In the instant action, plaintiffs make two claims: First plaintiffs say that the Regulations do not apply to Trans-Cuba's assets because all right, title and interest in those assets passed to the receiver prior to the effective date of the Regulations. In response, defendant argues that plaintiffs are precluded by the doctrine of res judicata from relitigating that claim in this action. Second, plaintiffs claim that the blocking

---

**4.** The Foreign Assets Control Regulations were extended to North Vietnam on May 5, 1964, to South Vietnam on April 30, 1975, and to Cambodia on April 17, 1975.

order violates the rights guaranteed to them by the due process clause of the Fifth Amendment to the Federal Constitution and the equal protection principle implicit therein.

### I. *Res Judicata*

■ Res judicata is a salutary doctrine that reflects "considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations." *Commissioner v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). Briefly stated, the judicial doctrine mandates that the parties to an action in which a judgment on the merits has been rendered are barred from relitigating the same cause of action in a second proceeding. *Expert Electric, Inc. v. Levine*, 554 F.2d 1227 (2d Cir.) *cert. denied* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977); *Saylor v. Lindsley*, 391 F.2d 965, 968 (2d Cir. 1968).

■ In the instant action, defendant seeks to apply res judicata defensively, that is, to bar a party who has had a full and fair opportunity to litigate an issue in another forum and had that issue decided adversely to him, from relitigating the issue in a current action. The doctrine of mutuality of estoppel, which once denied the favorable preclusion effects of a judgment to nonparties, has been dispensed with as a requirement to the imposition of res judicata. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327–29, 99 S.Ct. 645, 649–50, 58 L.Ed.2d 552 (1979). In its place the courts have adopted a rule that non-mutual issue preclusion is permitted unless it would be unfair. Wright, Miller & Cooper, *Federal Practice and Procedure*: Jurisdiction § 4464 p. 570 (1981).

■ Four questions must be answered when determining whether an issue is precluded from litigation by a previous action: is the bar asserted against a party or one in privity with a party; is the issue the same; was it resolved by a final judgment on the merits; and was there a full and fair oppor-

tunity to litigate the issue in the first action. Wright, Miller & Cooper, *supra,* at p. 572–73.

■ Plaintiffs themselves have admitted that they were parties to the first action (Pls' Memorandum of Law in Support of their Motion for Summary Judgment, p. 19). Both parties have stipulated that one of the objections the referee was ordered to hear and determine raised the issue of whether the Regulations applied to Trans-Cuba's assets in view of the transfer to the permanent receiver of all right, title, and interest in the assets prior to July 8, 1963, the effective date of the Regulations. *Stipulation* ¶ 8. The issue decided in the prior action is therefore the same sought to be precluded in the present action. There was also a final judgment on the merits in the prior action. Thus, three of the four questions have been answered satisfactorily.

The final question is whether plaintiffs had a full and fair opportunity to litigate the issue in the prior action. The views of both parties in the instant action were presented to the referee before he rendered his decision.[5] Plaintiffs' interest in the outcome of the prior and present actions is identical, and plaintiffs had the incentive to litigate this issue vigorously in the first action. There is no merit to plaintiffs' argument that an "altered legal situation," i.e. the time lapse since the prior action and the issuance of the 1974 amendments to the Regulations, renders res judicata inappropriate. This argument ignores the fact that the issue is a purely legal one: whether the appointment of a receiver affects the Regulations' application to Trans-Cuba's assets. Neither the passage of time nor the promulgation of the amendments has any bearing on this issue.

All requirements for the use of res judicata here have been satisfied. This court therefore holds that Referee Coleman's decision bars plaintiffs' contention that the Regulations do not apply to Trans-Cuba's assets and plaintiffs are precluded from relitigating this issue in the present action.

---

**5.** In a letter to the Referee dated February 10, 1969, the Government submitted its views to the Referee on whether the Regulations applied to Trans-Cuba's assets. *Stipulation* ¶ 9.

## II. The Fifth Amendment

### A. The Blocking Does Not Constitute a Taking in Violation of the Fifth Amendment.

Plaintiffs' second argument is that the continued blocking of Trans-Cuba's assets by the Regulations constitutes a constructive governmental taking without just compensation in violation of the Fifth Amendment. Such an attack on the government's freezing of assets has been rejected by every court that has previously considered this issue.

For example, in *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942), the Supreme Court rejected the contention of various foreign creditors of a Russian corporation that the Government of the United States had unconstitutionally taken property without just compensation by distributing American-based assets of the corporation to American citizens whose property had been expropriated by the communist takeover. The Court stated that:

> To be sure, aliens as well as citizens are entitled to the protection of the Fifth Amendment. A State is not precluded, however, by the Fourteenth Amendment from according priority to local creditors as against creditors who are nationals of foreign countries and whose claims arose abroad. By the same token, the Federal Government is not barred by the Fifth Amendment from securing for itself and our nationals priority against such creditors. And it matters not that the procedure adopted by the Federal Government is globular and involves a regrouping of assets. There is no Constitutional reason why this Government need act as the collection agent for nationals of other countries when it takes steps to protect itself or its own nationals on external debts. There is no reason why it may not make ... make itself and its nationals whole from assets here before it permits such assets to go abroad in satisfaction of claims of aliens made elsewhere and not incurred in connection with business conducted in this country.

315 U.S. at 228, 62 S.Ct. at 564 (citations omitted).

Moreover in *Sardino v. Federal Reserve Bank*, 361 F.2d 106 (2d Cir.) *cert. denied* 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966), the Second Circuit rejected the plaintiff's claim that the freezing of his American based assets under the very regulations under attack here constituted an unconstitutional taking of his property. In reaching its decision, the court noted the long history of governmental action compensating American citizens out of foreign assets in this country for wrongs done them by foreign governments, and the long line of cases upholding that action. 361 F.2d at 112. *See e.g. Guessefeldt v. McGrath*, 342 U.S. 308, 72 S.Ct. 338, 96 L.Ed. 342 (1952); *United States v. Pink, supra; United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937).

██ Among the cases cited by the Court in *Sardino* was *Propper v. Clark*, 337 U.S. 472, 484, 69 S.Ct. 1333, 1340, 93 L.Ed. 1480 (1949). In *Propper* the Supreme Court had noted that a pre-war freezing order served the salutary purpose of immobilizing the assets of foreign nationals until our government could determine whether they were needed "to compensate our citizens or ourselves for the damages done by the governments of the nationals affected." The Second Circuit in *Sardino* then reasoned that "[t]his would seem a rather clear intimation that if Congress should ultimately choose to apply the blocked assets of Cuban nationals to that purpose, the Fifth Amendment would not stand in its way." 361 F.2d at 106. *Accord Teague v. Regional Commissioner of Customs*, 404 F.2d 441 (2d Cir. 1968), *cert. denied*, 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969). Thus, it appears that there is ample authority to support the freezing of foreign assets by the United States Government in order to satisfy the present or future claims of American citizens.

Plaintiffs argue that the indefinite nature of the blocking amounts to a taking. In support of this argument they cite *Nielsen v. Secretary of the Treasury*, 424 F.2d

833 (D.C.Cir.1970). In *Nielsen*, the Court of Appeals upheld the Regulations and rejected an argument by Cuban refugees in the United States that the blocking of assets belonging to a Cuban corporation constituted a taking in violation of the Fifth Amendment. Before holding that there was no taking because no decision had been made to vest the assets in a third party, the Court of Appeals noted that "[t]he blocking of accounts is generally recognized as different from taking, though raising a problem of taking if continued indefinitely." 424 F.2d at 843–44. Plaintiffs assert that in light of the 1974 Amendments to the Regulations, allowing more individuals to obtain licenses unblocking previously frozen assets, and the passage of an additional ten years since the *Nielsen* decision, the indefinite blocking with respect to plaintiffs' assets amounts to a taking.

Plaintiffs' argument, while somewhat persuasive, must fail when confronted with the long line of cases upholding the Government's power to freeze foreign assets in order to satisfy claims of American citizens. Although this court is not qualified to judge the quality of the relationship between the United States and Cuba, it can say without doubt that it has not returned to normal. The objectives that the United States Government had when it originally blocked the assets of Trans-Cuba are therefore still valid. The blocked assets can still be used to preserve the assets of Cuba or its nationals for use in the future settlement of American claims against the Cuban government, as well as for negotiation with the Cuban government. *See Richardson v. Si-*

mon, 560 F.2d 500, 505 (2d Cir. 1977). The reasoning that supported the blocking of foreign assets in order to satisfy American claims did not become invalid with the passage of time, nor with the unblocking of some of those assets. There has thus been no taking in violation of the Fifth Amendment.

**B.** *The Fifth Amendment and Equal Protection*

 Plaintiffs' final argument is that the Regulations, as applied to them by the Secretary, violate the principle of equal protection implicitly guaranteed them by the due process clause of the Fifth Amendment.[6] Specifically, plaintiffs argue that the Regulations create an irrational and unlawful distinction insofar as they permit American citizen shareholders of Cuban corporations, as well as proprietors of Cuban proprietorships and limited and general partners of Cuban partnerships residing in the United States or an authorized trade territory, regardless of citizenship, to obtain licenses unblocking the assets, while denying that same right to non-citizen shareholders of Cuban corporations, even when the shareholders live in an authorized trade territory. In response, defendant contends that the legal differences between partnerships and corporations justify the different treatment of the groups, and that this difference is the result of a rational determination by the Government that the distinction is in the best interest of the country.[7]

While plaintiffs have offered a compelling argument, there are important factors

---

**6.** It is well settled that the Equal Protection Clause of the Fourteenth Amendment applies only to the states. It is equally well settled that although the Fifth Amendment lacks an express clause, the principle of equal protection is considered implicit in the Fifth Amendment's principle of due process, and is thereby applicable to the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**7.** In order to provide the opportunity to fully examine the merits of the claims, the parties were requested by Order dated April 8, 1981, to submit supplemental briefs on the issue of "whether the apparent distinction made by the

Cuban Assets Control Regulations between frozen assets held by members of Cuban partnerships and frozen assets held by shareholders in Cuban corporations has some rational basis." This court, prior to that time, had determined that the standard of review was the rational basis test. *See Richardson v. Simon*, 560 F.2d 500, 505 (2d Cir. 1977) ("The Act is constitutional when the statutory classification, as implemented by the Regulations, is 'the product of a deliberate and rational choice by Congress,'" quoting from *Alexander v. Fioto*, 430 U.S. 634, 640, 97 S.Ct. 1345, 1348, 51 L.Ed.2d 694 (1977)).

other than the Regulations themselves which must be considered in this case. This action involves a Federal executive agency and its treatment of aliens, as well as an area where critical foreign policy considerations are present. These factors are of great relevance to the determination of this case.

The Judiciary has long recognized that Congress and the Executive have broad discretion in the area of foreign affairs and foreign policy. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). This discretion is most relevant to the type of executive action involved here. Regarding the general character of the blocking measures involved in this case, the United States Supreme Court has observed:

> The freezing of Cuban assets exemplifies the capacity of the political branches to assure, through a variety of techniques..., that the national interest is protected against a country which is thought to be improperly denying the rights of United States citizens.

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 412, 84 S.Ct. 923, 932, 11 L.Ed.2d 804 (1964); *See also United States v. Pink*, 315 U.S. 203, 228, 62 S.Ct. 552, 564, 86 L.Ed. 796 (1942). Addressing itself to these same blocking regulations and the Trading with the Enemy Act upon which they are based, the Second Circuit has stated that "Congress, both in 1917 and when it later amended the Act, intended to give the President broad discretion in administering the Act...." *Richardson v. Simon*, 560 F.2d 500, 503 (2d Cir. 1977). *See also Tran Qui Than v. Blumenthal*, 469 F.Supp. 1202, 1211 (N.D.Calif.1979), *aff'd in part* 658 F.2d 1296 (9th Cir. 1981) (recognizing the "broad sweep of the government's power" in blocking the assets of Vietnamese corporations).

This court recognizes that the facts confronted by the courts in the previously cited cases are not precisely on point with the facts in this case. Plaintiffs argue that those cases involved distinctions made merely between citizens and non-citizens, while more complex distinctions are at issue here. The cases, however, do indicate that the weight of authority strongly supports wide latitude by the Congress and the Executive Branch in the regulation and distribution of blocked or attached American-based foreign assets.

Plaintiffs concede that the distinction between American citizen and non-citizen shareholders which was upheld in *Nielsen v. Secretary of the Treasury*, 424 F.2d 833 (D.C.Cir.1970), may have had the valid purpose the court recognized when the case was decided: the preservation of funds for American claimants against Cuba without prejudice to American shareholders. They argue, however, that the subsequent amendments unblocking partnership and proprietorship assets of non-citizens fundamentally altered that purpose. Plaintiffs assert that if American citizen shareholders together with proprietors and partners residing in authorized trade territories can obtain licenses, there is no reason why foreign shareholders living in authorized trade territories should not be granted licenses as well. Thus, plaintiffs argue that the Regulations, as amended, which grant licenses to American citizens and certain classifications of non-citizens while denying licenses to another classification of non-citizens, created an irrational and unlawful distinction. This presents an issue not faced before in the context of these blocking regulations.

■ As a starting point, this court notes that classifications which result in distinctions among non-citizens, especially when created by the federal government, are not *per se* unconstitutional. *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976). In *Mathews, supra*, 426 U.S. at 83, 96 S.Ct. at 1893, the Court upheld as not "wholly irrational" a federal statute which discriminated *within* a class of aliens in establishing eligibility requirements for medicare. In so ruling, the Court noted that decisions involving the relationship between the United States and aliens "are frequently of a character more appropriate to either the Legislature or the Executive than to the Judici-

ary." 426 U.S. at 81, 96 S.Ct. at 1892. The Court further noted that:

> any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and of the maintenance of a republican form of government. Such matters are so exclu-sively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.

426 U.S. at 81, n. 17, 96 S.Ct. at 1892, n.17, quoting from *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952).

Also relevant to the issues in this case is the Court's decision in *Hampton v. Mow Sun Wong*, *supra*. There the Court expressly examined the problem of judicial review of an equal protection challenge to the exercise of federal power over aliens. While the principle of equal protection is generally applied in the same manner to the federal government through the Fifth Amendment as it is to the states through the Fourteenth Amendment, *Hampton* clearly establishes additional criteria for review when federal power over aliens is involved. The Court noted that "there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual state." 426 U.S. at 100, 96 S.Ct. at 1904. The Court reiterated its position that "the power [of the federal government] over aliens is of a political character and therefore subject only to narrow judicial review." 426 U.S. at 101, n.21, 96 S.Ct. at 1904, n.21.

The fact that the Executive has broad discretion in this area does not mean, however, that the Judiciary must automatically defer to the exercise of that discretion when a federal constitutional challenge is raised. This court not only has the authority, but is bound by the Constitution, to adjudicate federal constitutional claims. Although plaintiffs are non-resident aliens, they, nevertheless, are entitled to the protection of the Constitution. As the Second Circuit has observed, the suggestion that the Constitution confers no rights on non-resident aliens is "patently erroneous in a case involving property in the United

States...." *Sardino v. Federal Reserve Bank*, 361 F.2d 106 (2d Cir.) cert. denied 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966).

It is with this background of constitutional doctrine in mind that the instant issues must be examined. While taking into account the Executive's discretion, if the distinctions made by the regulations as applied to plaintiffs are without a rational basis, they nevertheless violate the Constitution.

■ Defendant submits that the purposes of the blocking regulations are: 1) to establish a "pool" of assets for possible reparation of American citizens whose property was expropriated by the Cuban government; and 2) to use the blocked assets as a potential bargaining tool with the Cuban government over foreign policy matters.

Defendant contends that there are significant differences between corporations and partnerships which provide a rational basis for the distinctions in the Regulations. Defendant points to several general legal distinctions, noting that partners have a direct ownership interest in the partnership's assets as well as liability for the partnership's debts. On the other hand, a corporate shareholder has neither a direct ownership interest in a corporation's assets nor liability for its debts.

Furthermore, the Director of the Office of Foreign Assets Control, Dennis M. O'Connell, in his affidavit submitted by defendant, indicated that partnership and proprietorship assets were unblocked based on the presumption that such directly owned assets would not be vested and used in a future claims program (Aff. ¶ 11). He additionally stated that shareholders derive certain benefits from doing business in a corporate form which leaves them with only an indirect interest in the corporation's assets, and that the purpose being served by the distinction is that of preserving those assets for possible use in a claims program (Aff. ¶¶ 11 and 12).

In effect, the Regulations reflect decisions regarding what portions of the blocked assets will eventually be used in a possible claims program to reparate American citizens and what portions will be pro-

tected from such use. The exemption of American shareholders was prompted by a congressional resolution raising the possibility that without such an exemption, corporate assets in which Americans had an interest would be used in the possible claims program to satisfy the claims 'of other Americans against Cuba. Non-American citizen partners and proprietors residing in authorized trade territories were also exempted because, as asserted by Director O'Connell, their ownership interest in the assets is direct. Non-American citizen shareholders residing in authorized trade territories were not exempted, however, because their ownership interest in the assets is indirect. Plaintiffs argue that of all non-Cuban nationals, this latter group, in which they are included, is being forced by the regulatory classifications to "alone" sacrifice its "proprietary investments" for the purpose of providing a pool of funds to reparate Americans.

■ Defendant contends that the Government has the authority to give preference to American citizens over non-citizens in the distribution of foreign assets attached or blocked in the United States. The validity of such a proposition has been firmly established. *United States v. Pink, supra. Disconto Gesellschaft v. Umbreit,* 208 U.S. 570, 28 S.Ct. 337, 52 L.Ed. 625 (1908). The Second Circuit has recognized this with regard to the initial blocking measures in this case: "There is a long history of governmental action compensating our own citizens out of foreign assets in this country for wrongs done them by foreign governments abroad." *Sardino v. Federal Reserve Bank of New York, supra* 361 F.2d at 112. Furthermore, the Treasury Department policy of issuing unblocking licenses to American citizen shareholders but denying them to non-citizen shareholders has been upheld as not undercutting the reasonableness of the blocking program. *Nielsen v. Secretary of the Treasury, supra. See also Tran Qui Than v. Blumenthal, supra* (blocking assets of Vietnamese corporations upheld against Vietnamese refugee shareholders' claims).

It must be noted, however, that those cases involved the consideration of regulatory action which favored American citizens over non-citizens. In this case, the government has not only undertaken to protect the assets of American citizens from future use in a claims program, but it has done so for certain non-citizens as well, specifically, partners and proprietors residing in authorized trade territories. Having gone beyond the initial purpose of merely protecting American interests, which has been recognized as valid in the previous cases, the Government is now protecting the interests of some non-citizens as well. The issue, then, is whether the forms of the business enterprises and the consequent legal interests in them provides a rational basis for treating them differently.

The difference in ownership interests clearly provides a rational basis for granting more protection to partners, who have a direct ownership interest in the blocked assets, than to shareholders, whose interest is merely indirect. The two forms of interests in the assets are substantially different and carry with them substantially different rights and liabilities which are well recognized by law. Because plaintiffs' interest in the assets is only indirect, it does not *require* the same protection or exemption from potential use in a future claims program as the interest of those who directly own portions of the assets. In *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the Court reviewed a state's administration of AFDC benefits. In upholding the state's program, the Court stated that "the Equal Protection Clause does not require that a state must choose between attacking every aspect of a problem or not attacking the problem at all." *Id.* at 486–87, 90 S.Ct. at 1162. Similarly, the Executive Branch is not required to protect *every* interest which is affected by the blocking regulations, particularly when substantially different interests are at stake.

Furthermore, it bears noting that this case does not concern the actual disbursement of the assets in a vesting program to satisfy those with claims against Cuba. Such a program is not now in effect, nor has it been suggested that it will be in the

near future. Instead, what is at issue here are selective unblocking measures exempting certain assets from use in a *possible* future claims program.

Plaintiffs' interests in the assets may be recognized at a later date, perhaps during the course of negotiations with Cuba about the final disposition of the assets. It would be premature for this court to now hold that the selective unblocking measures violate plaintiffs' rights. The ultimate disposition of the assets is, at this point in time, a matter of speculation. The selective unblocking measures challenged here will not affect that ultimate disposition.

Defendant also points out that because Trans-Cuba is a nationalized corporation, the Cuban government may assert a claim in the American courts as a "successor in interest" to the corporation's assets presently blocked by the Regulations. The possibility that the Cuban government may assert such a claim has been considered in previous cases involving blocked assets of nationalized corporations. The Court in *Nielsen v. Secretary of the Treasury, supra,* 424 F.2d at 842, noting that "the corporate entity and national character of the Cuban corporation" should be considered, held that the federal government

> is at least presumptively acting reasonably and without being subject to the charge of arbitrary or tyrannical action, if it assumes that the assets owned by a Cuban corporation are assets in which there is a Cuban national interest.

Similarly, in *Tran Qui Than v. Blumenthal, supra,* 469 F.Supp. at 1211, the court stated that a "government with the power to expropriate also has the power to assert a claim as the successor to an expropriated bank's foreign-based assets."

The implications of this were recognized in *Nielsen, supra,* when the Court observed that there was

> the possibility, perhaps the likelihood, that the foreign country will assert an interest in the assets of corporations organized under its laws. An important, if not dominant, star for guiding national actions is the desire to build future areas of settlement and good will between na-

tions to replace present areas of tension. It is not unreasonable for the American authorities to treat the property of a Cuban corporation as a matter of Cuban interest and concern, when this and future Cuban governments are likely, with some support in fundamental legal principles, to assert such an interest.

*Id.* at 842.

The Second Circuit's recent decision in *Vishipco Line v. Chase Manhattan Bank, N.A.,* 660 F.2d 854 (2d Cir. 1981), does not undercut the court's reasoning in *Nielsen.* At issue in *Vishipco Line* was whether the corporate plaintiffs, which were allegedly nationalized by the government of Vietnam, had standing to bring suit. In deciding that question, the Second Circuit held that it cannot be assumed that the nationalizing government has become the successor in interest to the corporation unless "the government stepped into the shoes of the [corporation] by formally assuming [its] assets and liabilities, thus replacing the former management." *Id.* at 861. The facts stipulated by the parties here do not support a finding either way on this issue. The mere *risk,* however, of Cuba's asserting a successor interest is of sufficient foreign policy concern that it provides a rational basis for treating corporations differently in the Regulations than partnerships, which are business entities in which the Cuban government cannot assert a successor interest. This risk, recognized in *Nielsen,* was not at issue in *Vishipco Line.*

In the instant case, the Executive Branch had before it the specter of strained international relations caused by the possibility of Cuba's bringing lawsuits in the American courts as a successor in interest. The Executive Branch acted rationally when it attempted to minimize this possibility by making a distinction in the Regulations between partnership and shareholder assets. This court will not now disturb its decision to regulate the pool of assets in a manner it deemed consistent with this country's foreign policy interests.

Accordingly, plaintiffs' motion for summary judgment is denied and defendant's motion for summary judgment is granted.